1  Marshall Samuel Sanders, *Pro Se*
2  Lydia Ong Sanders, *Pro Se*
   1621 Kensing Lane
   Santa Ana, CA 92705-3074
3  Telephone: (714) 665-8012
   Facsimile: (714) 665-8012
4  E-mail: marshallssander@yahoo.com

5  Marshall S. Sanders and Lydia O. Sanders, Trustee(s), or any Successor Trustee(s) of the Marshall

6  and Lydia Sanders Trust Dated April 20, 1990, appearing as Trustees, *Pro Se*

7

   ## UNITED STATES DISTRICT COURT FOR THE
8

9  ## CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DIVISION-SANTA ANA

10
   Marshall S. Sanders and Lydia O. Sanders,       ) Case No.: 8:15-cv-00935-AG-AS
11                                                  )
   Trustee(s) of the Marshall and Lydia Sanders    ) REPLY TO DEFENDANTS' RESPONSE TO
12                                                  ) THIS COURT'S ORDER TO SHOW CAUSE
   Trust Dated April 20, 1990,                      ) WHY A PRELIMINARY INJUNCTION
13                                                  ) SHOULD NOT ISSUE
                                                    )
14                Plaintiff,                         )
                                                    ) Date:
15        vs.                                        ) Time:
                                                    ) Courtroom:
16                                                  )
   Bank of America, N.A.; Wells Fargo Bank,          ) Trustee's Sale Date: September 22, 2015
17                                                  ) Trustee's Sale Time: 12:00 P.M.
   N.A., as trustee, on behalf of the Harborview     )
18                                                  )
   Mortgage Loan Trust Mortgage Loan Pass-           )
19                                                  )
   Through Certificates, Series 2007-1; National     )
20                                                  )
   Default Servicing Corporation; Select             )
21                                                  )
   Portfolio Servicing, Inc.; and Does 1-20,         )
22                                                  )
                Defendants.                          )
23                                                  )
24
25        There is **no** default.

26        Plaintiffs are not now, nor ever have been, in default on the loan that is at issue. Discovery

27  will prove-up the absence of default. Once all of the Defendants' books are laid bare, the truth will
28

- 1 -

REPLY TO DEFENDANTS' RESPONSE TO THIS COURT'S ORDER TO SHOW CAUSE WHY A PRELIMINARY
INJUNCTION SHOULD NOT ISSUE

come out that Defendants have been cooking the books so far beyond insolvency as to make each Defendant a "radioactive" CERCLA candidate.

Plaintiffs submit to the Court two (2) different documents purporting to show Plaintiffs' "Kensing Lane" property scheduled for foreclosure by Trustee's Sale on September 22, 2015 at 12:00 p.m. The first document, Exhibit 1, is proprietary to Defendant National Default Servicing Corporation (hereafter, "NDS").

The second document, Exhibit 2, is proprietary to non-defendant Lender Processing Services ("LPS"), a mortgage document (Note, Deed of Trust, Assignment, Notarization and Power of Attorney document fabrication factory, a controlled affiliate of both Defendants Bank of America and Wells Fargo Bank). LPS' proprietary website identifies the Sanders' property, "Kensing Lane," as in foreclosure. The "Kensing Lane" property is *scheduled* to be foreclosed on September 22, 2015, exactly as notated in the two (2) just previously mentioned exhibits. The documents being used to foreclose on both homes by all Defendants, is false, fabricated, forged and fraudulent, prepared by LPS, a Bank of America and Wells Fargo Bank controlled "affiliate" that forges, fabricates, falsifies and records for a price (see price list attached: Exhibit 3), all for one purpose and goal, to foreclose and evict. DocX is a unit of LPS, which is a unit of Black Knight (see Exhibit 4).

I respectfully reserve the balance of my 10-page limit to provide, hopefully, helpful information for the Court's deliberations in the form of attached exhibits. The Court's precious time will not be taken up by redundancies or histories. The Court deserves to have all of the information, even if it *hurts* Plaintiffs.

REPLY TO DEFENDANTS' RESPONSE TO THIS COURT'S ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

DATED: September 17, 2015

_____
Marshall S. Sanders, Trustee
*In Pro Per*

_____
Lydia O. Sanders, Trustee
*In Pro Per*

– 3 –

REPLY TO DEFENDANTS' RESPONSE TO THIS COURT'S ORDER TO SHOW CAUSE WHY A PRELIMINARY
INJUNCTION SHOULD NOT ISSUE

## CERTIFICATE OF SERVICE

BY PERSONAL DELIVERY OR ELECTRONIC MAIL OR U.S. MAIL (PRECISE METHOD INDICATED NEXT TO JUDGE OR PARTY OR COUNSEL)

I, the undersigned, state that I am a citizen of the United States, a resident of the County of Orange, State of California, and that I am over the age of eighteen (18) years and not a party to the within cause; and that my residence address is 1621 Kensing Lane, Santa Ana, California 92705-3074.

I am readily familiar with the mailing practice in my neighborhood for collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of daily affairs, correspondence is deposited with the United States Postal Service the same day it is submitted for mailing. On September 17, 2015, I served a true copy of:

**REPLY TO DEFENDANTS' RESPONSE TO THIS COURT'S ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

upon:
**Hon. Andrew J. Guilford, 411 W. Fourth St., Courtroom 10D, Santa Ana, CA 92701 (via the clerk's widow as instructed by court personnel)**
**Locke Lord, 300 S. Grand Avenue, Suite 2600, Los Angeles, CA 90071-3194: csison@lockelord.com; sdelrahim@lockelord.com; aileen.ocon@lockelord.com**
**Adam Frederick Summerfield, McGuire Woods LLP, 1800 Century Park East, Suite 900, Los Angeles, CA asummerfield@mcguirewoods.com**

[XX] By Electronic Mail – serving the enclosed via e-mail transmission to each of the parties with an email address.

[  ] By U.S. Mail – by placing it for collection and mailing, in the course of ordinary business practice, with other correspondence, enclosed in a sealed envelope, with postage fully prepaid, addressed to all parties who do not have an email address.

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Santa Ana, California on September 17, 2015

Starr Sanders



**National Default Servicing Corporation**
7720 N. 16th Street, Suite 300, Phoenix, Arizona 85020
Telephone: 602-264-6101 | Facsimile: 602-264-6209

*This report is prepared as a courtesy only. It is not issued in lieu of forms of notice required by Statute (i.e. recording, posting, publishing and mailing), and in the event of any error or incompleteness does not impair the effectiveness of notices given by statutory methods. The information contained herein is believed to be accurate as of the time of viewing, but interested parties must attend the sale to obtain the most recent information of particular importance or to obtain updated information. Any listing here of a "possible postponement date" is an estimate of the action that will be taken at the time of sale as now scheduled, and is not a commitment to postpone. Until the actual date and time currently set for the sale, the beneficiary and trustee reserve the right to proceed to sale as scheduled, or to declare a postponement until some other date and/or location. Please note for efficiency/space purposes, we are only providing the street address of the property as a point of reference rather than the only controlling, binding description of the property, which is the legal description.*

Sale Start Date: 9/17/2015    Sale End Date: 9/22/2015    [ Search ]

Records per Page : 20    File # (blank for all): 12-20866    Files 1 - 1 (of 1 Total)

☒ Click Here To Hide Options

Exclude Closed Files ☑    Address contains (blank for All): _____    City starts with (blank for All): _____

Exclude On Hold Files ☐    County starts with (blank for All): _____    Zip Code (blank for all): _____

As of Thursday, September 17, 2015 at 1:05 PM

«  ‹  1  ›  »

THIS SECTION IS A LEGEND / EXPLANATION OF INFORMATION PROVIDED BELOW ONLY

| Sale Date (previous) (projected) | File # | Loan Date | Mortgage Co | Org Ln Amt | File Status | Opening Bid Amount (o) |
|---|---|---|---|---|---|---|
| Sale Time | Property Address | | | | Trustor | Max Bid Amount (m) |
| Place of Sale | | | | | County | Sale notated as Canceled (X) |
| 9/22/2015 | 12-20866-SP-CA | 12/22/2006 | Select Portfolio Servicing | $1,435,000.00 | Suspended | |
| 12:00 PM | 1621 KENSING LANE, SANTA ANA, CA 92705-3074 | | | | SANDERS TRUSTEE[S] | |
| At the North front entrance to the County Courthouse, 700 Civic Center Drive West, Santa Ana, CA 92701 | | | | | ORANGE | |

*Exhibit "3"*

# AGENCY SALES AND POSTING
A SUBSIDIARY OF SERVICELINK, LLC

## Basic Property Search

| | | |
|---|---|---|
| **TS#:** | 12-20866 | **ASAP#:** |
| **APN:** | | **Property Address:** |

Username: marshallssanders@ya

Password: •••••••••••  [ Login ]

Username/ Password Help

Sign Up for Advanced Search

Basic Property Search

Services

Contact Us

Frequently Asked Questions

Search          Clear

**Sale history is limited to 7 days prior to today**

### Your search returned **1** record(s).

Displaying 50 records per page:

1

| Sale Date | Property Detail | | Sale Detail | |
|---|---|---|---|---|
| **Tuesday 09/22/2015 12:00 PM** | **Address:** | 1621 KENSING LANE | **Sale Status:** | Postponed to 09/22/2015 |
| | | | **TS Number:** | 1220866SPCA |
| | | | **ASAP Number:** | 4493142 |
| | **City:** | SANTA ANA | **Notice of Sale Amt:** | $1,970,340.44 |
| | **State:** | CA | **Opening Bid Amt:** | 0 |
| | **Zip:** | 927053074 | **Sold Amt:** | 0 |
| | **County:** | Orange | **Sale Location:** | At the North front entrance to the County Courthouse, 700 Civic Center Drive West, Santa Ana, CA 92701 |
| | **APN:** | 502-081-13 | **Trustee:** | National Default Servicing Corp |
| | | | **Trustee Phone#:** | (602)264-6101 |

1

**Create a user login for Advanced Search options**

Copyright © 2014   Black Knight Financial Services, Inc., All rights reserved.

Privacy Statement  │  Site Support (2) | v4.1.5.20666

*Exhibit 3*



 

**DOCX Home**
**About DOCX**
**What's Up @ DOCX**
**Contact DOCX**

| Online Services | Downloads | Services | Products |

 **GETNET™ DOCUMENT RECOVERY**

DOCX's GetNet™ Document Recovery solution is a national network of runners that is engaged to provide document recovery, expedited recordation services, title searches, and insurance submissions.

The service is unique in that our clients can request that DOCX obtain any missing recordable documents through this web site through our online GetNet™ Work Order Form.  Status of existing projects can also be obtained through our Online Services. We also accept work orders the "old fashioned" way via fax or mail. Upon receipt of the work order, DOCX will access the national network of runners, place the order and follow up to ensure prompt delivery.

GetNet™ was designed to assist mortgage servicers in meeting agency certifications and to avoid costly penalties for filing late satisfaction pieces.

## GetNet™ Features

- A National Network of title runners retains presence in every county jurisdiction nationwide.
- Obtains missing mortgage documents, assignments, title policies and LGC/MICs.
- Expedites recordation by physically walking documents in to county recorder offices.
- Provides title searches to identify mortgage holders.
- Provides online reporting capabilities.

## GETNET™ RATE SHEET

| XCODE | SERVICE | AMOUNT |
|-------|---------|--------|
| INF1 | Obtain PIN Number from Online Public Records | $5.50 + SH |
| INF2 | Obtain from Online Public Records Lot Block or Section | $5.50 + SH |
| INF3 | Obtain Property Address | $5.50 + SH |
| INF4 | Obtain Recorded Mortgage, Book, Page or Instrument Number | $12.95 + TPC |
| INF5 | Obtain Vehicle Identification Number | $12.95 + SH |
| CT01 | Cursory Title Search to Identify Mortgagee of Record | $15.95 + TPC |
| TS01 | Perform Complete Title Search | $15.95 + TPC |
| SI01 | Obtain Copy of Mortgage | $12.95 + TPC |
| SI02 | Cure Defective Mortgage | $12.95 + TPC |
| SI03 | Retrieve Certified Copies of Mortgages | $12.95 + TPC |
| PA01 | Obtain Copy of Power of Attorney or Name Certification | $12.95 + TPC |
| PA02 | Record Power of Attorney | $12.95 + TPC |

| PA03 | Obtain Clerk Certified Copy of Power of Attorney | $12.95 + TPC |
|------|--------------------------------------------------|--------------|
| IC01 | Obtain Copy of Installment Contract from VA | $15.95 + SH |
| SA01 | Obtain Copy of Subordination Agreement | $15.95 + TPC |
| MA02 | Obtain Copy of Modification | $15.95 + TPC |
| MI01 | Obtain Copy of MIC | $12.95 + SH |
| MI02 | Correct MIC | $12.95 + SH |
| LG01 | Obtain Copy of LGC | $12.95 + SH |
| LG02 | Correct LGC | $12.95 + SH |
| TP01 | Obtain Copy of Title Policy Within 7 years (based on calender year) | $19.95 + TPC |
| TP02 | Correct Existing Title Policy | $19.95 + TPC |
| TP03 | Obtain Copy of Title Policy over 7 years (based on calender year) | $29.95 + TPC |
| TP04 | Obtain Quotes to Write and Order New Lenders Title Policy | $29.95 + TPC |
| TP05 | Obtain Abstract from Title Company (State of Iowa) | $15.95 + TPC |
| TE02 | Correct Title Policy Endorsement | $15.95 + TPC |
| LN02 | Create Lost Note Affidavit | $12.95 + SH |
| NA01 | Create Note Allonge | $12.95 + SH |
| NC01 | Name Affidavit | $12.95 + SH |
| IA01 | Obtain Copy of Assignment | $15.95 + TPC |
| IA02 | Retrieve Certified Copies of Assignments | $15.95 + TPC |
| IA03 | Create Missing Intervening Assignment | $35.00 + TPC |
| IA04 | Record Prepared Assignments | $12.95 + TPC |
| IA05 | Cure Defective Assignment | $12.95 + TPC |
| IS01 | FHA and VA Mortgage Insurance Submission | $95.00 + TPC |
| UC01 | Retrieving a UCC Package | $15.95 + TPC |
| CF01 | Recreate Entire Collateral File | $95.00 + TPC |
| ER01 | Expedited Recordation: Hand Carry Recordable Documents | $25.00 + TPC |

**Contact DOCX for volume discounts on orders of 200 items or more.**

**TPC =** Third Party Costs include Title Runner, County Jurisdictional, courier and postage costs.

**SH =** Shipping costs.

*The DOCX Service Fee will be invoiced upon receipt of the work order.*

*TPC and SH costs will be billed upon completion of the work order.*
*You can also place orders online at www.docx.com.*

## Getting Started

To get started using the DOCX GetNet Service:

- Complete the **DOCX GetNet™** Service Agreement and obtain a Client ID.  **CALL DOCX   Marketing at: 888/DOCX-NET 888/362-9638 or email <u>sales@docx.com</u>** for an Agreement and Client ID.
- Once you complete the agreement and obtain a Client ID you can submit **GetNet™ Work Order Forms**. Clients can send work orders via the internet, email, fax, or mail.  **CALL DOCX   Marketing at: 888/DOCX-NET 888/362-9638 or email <u>sales@docx.com</u>**  for a Work Order form, *or* how to submit **GetNet™ Work Order Forms** online.
- Contact **DOCX Support at 800/723-0215 Ext 3014 or email <u>support@docx.com</u>** for requirements and procedures of email and online **GetNet™ Work Order Form**.

Exhibit 4



THE FORECLOSURE HOUR
America's First National Foreclosure Talk Show Is On The Air!

Click Here

Do a Discount Double Check and get
discounts up to 40% on auto insurance.
*Not available in all states.

&& StateFarm

Get A Quote ▶

FREE ACCESS
DURING
BETA TESTING

THE T☢XICITY TEST
A Mortgage Risk Assessment Tool For
Borrowers, Attorneys, and Advocates

mcdonnell
PROPERTY ANALYTICS

Click to learn more ▶

HOME
DISCLAIMER
SITE MAP
EMAIL A TIP
SUPPORT
SUBSCRIBE
ADVERTISE

Enter search keyword    Search ❂



STOPForeclosureFraud.com

GEICO▶

Saving money brightens your day :)    Begin a Quote

CLASS ACTIONS
DEPOSITIONS
Education »
Foreclosure Laws »
LPS 101
MERS 101
NTWC 101
Securitization 101

## LPS 101

Like ⟨ 71    G+1

Some tid-bits from DOCX's formation from their website in 1998:

*DOCX was established in March of 1993 by its president, **Lorraine O. Brown**. It's a privately held Colorado Limited Liability Company. DOCX set up headquarters in Springfield, Ohio. In October 1994, DOCX merged forces with Ontrak Services. Ontrak was a pioneer in the development of outsourcing services for assignment and satisfaction processing. With the acquisition of Ontrak, DOCX expanded its operations to Frederick Maryland. DOCX has recently established a marketing/sales office in Atlanta, Georgia. DOCX operations continue to run in both the Springfield, Ohio and Frederick, Maryland locations.*

*[…]*

*DOCX developed two software products; DOCX RID™ (Recorders Information Database) which keeps track of County Recorder fees, and the requirements for recording assignment and satisfaction documents, UCC's, and to obtain certified true copies of recorded documents. DOCX's latest software development, DOCX in a BOX™, takes the **DOCX RID program significantly further by providing the software to produce the completed and legally-sufficient documents** required to process…*

## LPS 101 Links

### Lender Processing Services, Inc. (LPS) is now Black Knight Financial Services

### Over 1 Million Documents Prepared and Filed with Forged and False Signatures, Fraudulent Notarizations - FORMER LPS EXECUTIVE SENTENCED TO 5 YEARS IN PRISON FOR ROLE IN MORTGAGE-RELATED DOCUMENT FRAUD SCHEME

**Lender Processing Services Announces $127 Million Multi-State AG Foreclosure Fraud Settlement**

.ff

**Lender Processing Services (LPS) Internal Email Accidentally Leaked in a Fraudclosure Case, Will CFPB Investigate?**

**Lender Processing Services Announces Multi-State AG Foreclosure Fraud Settlement**

**Former Executive at Florida-Based Lender Processing Services Inc. Admits Role in Mortgage-Related Document Fraud Scheme – Over 1 Million False Docs**

**INDICTMENT | Lorraine Brown, Former Founder of DOCX 12.20.2012**

**Attorney General Koster announces plea agreement with Lorraine Brown – Former President of DocX to plead guilty for national mortgage document robo-signing practices –**

**Guilford County, NC vs LPS/DocX, MERSCORP, MERS, Inc. et al**

**INDICTMENT | State of Missouri vs DOCX, LLC a Georgia corporation**

**COMPLAINT | STATE OF NEVADA vs. LENDER PROCESSING SERVICES INC., FNIS, DOCX**

**Nevada AG officially sues LPS for allegedly falsifying foreclosure documents, consumer fraud**

**Nevada Office of the Attorney General ANNOUNCES indictment in massive clark county robo-signing scheme, Employed by LPS**

TOP (5) Card Processors

🌐 creditcardprocessing.net/S…

**HSBC FORECLOSURES AND THE NEWTRAK SYSTEM OF LENDER PROCESSING SERVICES**

**PETITION | American Home Mortgage Servicing Inc. Vs. Lender Processing Services Inc., DOCX "Bombshell Admission of Failed Securitization Process"**

AHMSI sues LPS and DocX over robo-signing scandal

SENATOR ELEANOR SOBEL, REP. DARREN SOTO PROBE DEEPER INTO FIRINGS OF ASSISTANT ATTORNEYS GENERAL

BREAKING: LPS CEO Jeffrey S. Carbiener Resigns, Effective Immediately

FDIC Hits Lender Processing Sevices (LPS) with $155 Million Suit, 8k Form Filing

Michigan Attorney General Subpoenas Three Mortgage Processors in Probe (LPS, FNF, CT CORP. SYSTEMS)

Attorney General Kamala D. Harris Subpoenas Loan Processor LPS in Wide-Ranging Probe of Mortgage and Foreclosure Practices

MADIGAN ISSUES SUBPOENAS TO LPS, NationWide Title Clearing ; WIDENS 'ROBOSIGNING' PROBE

BLOCKBUSTER FRAUD | LA BK Judge Grants Motion For Sanctions Against Lender Processing Services (LPS) Liability IN RE: WILSON

Florida AG Subpoenas Law Firms Ben-Ezra & Katz, Marshall C. Watson Concerning LPS's "Pay Per Click" Program

Gretchen Morgenson takes on Regulators, LPS and the Shoddy Practices and Sloppy Accountings of the Mortgage Service Industry

DOCX Linda Green Had NO AUTHORITY To Sign For MERS 10/08-10/09



SAMPLE: FIDELITY "NETWORK AGREEMENT" BETWEEN LAW FIRMS

Foreclosure Mills and The 4 Minute Foreclosure

FLORIDA AG ISSUES SUBPOENAS TO LENDER PROCESSING SERVICES (LPS) & DOCX 10-13-2010

MUST READ| IS LPS's Aptitude Solutions Software In Your County Courts & Land

**Records???**



# DOCX / LPS Price List…any documents you want!

**Lender Processing Services LPS and ProVest: Resemblance is uncanny**

**\*BREAKING NEWS\* Economic Crimes Division in Ft. Lauderdale, Florida \*INVESTIGATING\* FLORIDA DEFAULT LAW GROUP "FORECLOSURE MILL" & LENDER PROCESSING SERVICES "DOCx, LLC"**

**Florida AG investigating LPS subsidiary: Jacksonville Business Journal**

**MORTGAGE ASSIGNMENTS AS EVIDENCE OF FRAUD, by Lynn Szymoniak, ESQ.**

**MORTGAGE SERVICING COMPANIES PREPARING "REPLACEMENT" MORTGAGE ASSIGNMENTS: By Lynn E. Szymoniak, Esq., Ed.**

**Fidelity's LPS Secret Deals With Mortgage Companies and Law Firms**

**BOGUS ASSIGNMENTS 2…I'm LOVING this!! LPS DOCx ADMISSIONS SEC 10K ROOFTOP SHOUT OUT!**

**2009 Mortgage Assignments – Over a Trillion Dollars – Sure There Were…**

**LENDER PROCESSING SERVICES (LPS) BUYING UP HOMES AT AUCTIONS? Take a look to see if this address is on your documents!**

**TOPAKO LOVE; LAURA HESCOTT; CHRISTINA ALLEN; ERIC TATE …Officers of way, way too many banks Part Deux "The Twilight Zone"**

**ARE FORECLOSURE MILLS Coercing Buyers for BANK OWNED homes? ARE ALL THE MILLS?**

**AN ASSIGNMENT OR A FORMALIZATION OR A MEMORIALIZATION? By LYNN E. SZYMONIAK, ESQ.**

**LENDER PROCESSING SERVICES (LPS) "SECRET INSTRUCTIONS" to FORECLOSURE MILLS**

How To:   Lift Saggy Skin



Watch Presentation >>          Beverly Hills MD

**DOUBLE TROUBLE: Sanctions Motion filed 5/21/2010 Against LENDER PROCESSING SERVICES (LPS)**

**HARRIS CASE: Fidelity, LPS Secret Deals With Mortgage Companies and Law Firms**

# DEPOSITIONS

**CHERYL D. THOMAS**
Deposition Transcript of DOCx, LPS CHERYL DENISE THOMAS
**CHRISTIAN S. HYMER**
FULL DEPOSITION TRANSCRIPT OF CHRISTIAN S. HYMER 1ST VP OF OPERATIONS FOR LENDER PROCESSING SERVICES
(LPS) MINNESOTA
**WILLIAM "BILL" NEWLAND**
DEPOSITION TRANSCRIPT OF LPS/ FIDELITY BILL NEWLAND
**SCOTT A. WALTER**
FULL DEPOSITION TRANSCRIPT OF LENDER PROCESSING SERVICES "LPS" SCOTT A. WALTER PART 1
FULL DEPOSITION TRANSCRIPT OF LENDER PROCESSING SERVICES SCOTT A. WALTER PART 2 "STEVEN J. BAUM, P.C.", "O.
MAX GARDNER", "US TRUSTEE"
**GREGORY "GREG" ALLEN**
FULL DEPOSITION TRANSCRIPT OF LPS GREG ALLEN "MERS IS ALIVE"

## 60 Minutes
Video does not show go **HERE**

# CLASS ACTIONS

**FLORIDA CLASS ACTION: Alleging Lender Processing Service "LPS" Violated Federal Securities Laws**

**FL Saxena White P.A. Files Securities Fraud Class Action Against Lender Processing Services, Inc.**

**ATTORNEY NICK WOOTEN CLASS ACTION AGAINST WELLS FARGO, LENDER PROCESSING SERVICES INC.**

**KENTUCKY RICO CLASS ACTION INVOLVING MERSCORP, LPS, DOCX, GMAC, DEUTSCHE BANK, US BANK et al**

**KABOOM BOOM BOOM!! ATTORNEY NICK WOOTEN CLASS ACTION AGAINST WELLS FARGO, LENDER PROCESSING SERVICES INC.**

## FIS INCENTIVE 2006 WINNERS

FIS Incentives 2006 Winners



[ipaper docId=46258574 access_key=key-2hfi1i8hv2w0765d15l5 height=600 width=600 /]

## THE ART WORK

These employees are from DOCx In Alpharetta, GA
AKA LENDER PROCESSING SERVICES INC

STOPForeclosureFraud.com

**F O R G E R I E S**

American Home Mortgage Servicing, Inc. as
successor-in-interest to Option One Mortgage Corporation

Witness: Dawn Williams

Witness: Christina Huang

Linda Green
Vice President

Tywanna Thomas
Asst. Vice President

Citigroup Global Markets Realty

Witness: Korell Harp

Witness: Christina Huang

Linda Green
Vice President

Tywanna Thomas
Asst. Vice President

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC.

Witness: Dawn Williams

Witness: Christina Huang

Linda Green
Vice President

Tywanna Thomas
Asst. Secretary

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Witness:

Witness: Helen Thomas

Linda Green
Vice President

Jessica Ohde
Asst. Secretary

## ALL THESE CORPORATE HATS
## full of forged signatures

Mortgage Electronic Registration Systems, Inc. as nominee for
American Home Mortgage Acceptance, Inc.

Witness: Korell Harp

Witness: Helen Thomas

Linda Green
Vice President

Jessica Ohde
Asst. Secretary

American Home Mortgage Servicing, Inc. as successor-in-interest
to Option One Mortgage Corporation

Witness: Korell Harp

Witness: Christina Huang

Linda Green
Vice President

Tywanna Thomas
Asst. Vice President

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC., acting solely as nominee for AMERICAN HOME
MORTGAGE

Witness: Korell Harp

Witness: Christina Huang

Linda Green
Vice President

Linda Thoresen
Asst. Secretary

These are employees of "LPS"
Lender Processing Services in Minnesota
Compare Signatures and Employers

STOPForeclosureFraud.com

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
INDYMAC BANK, F.S.B.
By:
Typed Name: Christina Allen
Title: Asst. Secretary

Attest:
Typed Name: Topako iave
Title: Asst. Secretary

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
CASA BLANCA MORTGAGE, INC. D/B/A SHEARSON
MORTGAGE
By:
Typed Name: Laura Hescol
Title: Vice President

Attest:
Typed Name: Topako Lave
Title: Asst. Secretary

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
QUICKEN LOANS INC.
By:
Typed Name: Laura Hescott
Title:

Attest:
Typed Name: Topallalove
Title: Asst. Secretary
(Affix Corporate Seal)

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
INDYMAC BANK, F.S.B.
By:
Typed Names: Laura Hescott
Title: VP

Attest:
Typed Name: Christna Alle
Title: VP
(Affix Corporate Seal)

OPTION ONE MORTGAGE CORPORATION
By:
Typed Name: Laura Hescott
Title: Assistant Secretary

Attest:
Typed Name: Eric Tate
Title: Assistant Secretary

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR THE
MONEY TREE FINANCIAL CORPORATION
By:
Typed Name: Laura Hescott
Title: VP

Attest:
Typed Name: Topallalone
Title: Asst. Secretary
(Affix Corporate Seal)

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
INDYMAC BANK, F.S.B.
By:
Typed Name: Christina Allen
Title: Asst Secretary

Attest:
Typed Name: Topako Love
Title: Asst. Secretary
(Affix Corporate Seal)

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED, AS NOMINEE FOR
INDYMAC BANK, F.S.B.
By:
Typed Name: Laura Hescott
Title: VP

Attest:
Typed Name: Christina Allen
Title: VP

INDYMAC BANK FSB, AS ATTORNEY-IN-FACT FOR
DEUTSCHE BANK NATIONAL TRUST
By:
Typed Name: Laura Hescott
Title: VP

Attest:
Typed Name: Christina Allen
Title: Asst. Secretary
(Affix Corporate Seal)

Washington Mutual Bank, as successor in Interest to Long Beach Mortgage
Company, by Operation of Law
By:
Asst Vice President
Name: Laura Hescott
Address:

Washington Mutual Bank, as successor in Interest to Long Beach Mortgage
Company, by operation of law
By:
Asst-Vice President
Name: Christina Allen
Address:
Asst. Vice Secretary   Eric Tate

# BOGUS ASSIGNEE ASSIGNMENT

INSTR #
11/05/20
Rec. Fee $10.00

Document Prepared By:
Ron Meharg, 888-362-9638
When Recorded Return To:
DOCX
1111 Alderman Dr.
Suite 350
Alpharetta, GA 30005

AHMA   647   8030382634

*AHMA-647-0930382634*

CRef#:10/05/2008-PRef#:A030-POF
Date:09/23/2008-Print Batch ID:1900
MIN #:
MERS Telephone #: 888/679-6377
Property Address:

STOPForeclosureFraud.com

This Space For Recorder's Use Only

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, American Home Mortgage Acceptance, Inc., whose address is 538 Broadhollow Road, Melville, NY 11747, does by these presents hereby grant, bargain, sell, assign, transfer, convey, set over and

## BOGUS ASSIGNEE FOR INTERVENING ASMTS

promissory note(s) for the sum listed below, together with all rights therein and thereto, all liens created or secured thereby, all obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such mortgage.

Original Borrower(s):
Original Mortgagee: Mortgage Electronic Registration Systems, Inc. as a nominee for American Home Mortgage Acceptance, Inc.
Date of Mortgage: 01/20/2005
Recording Date: 01/20/2005
and recorded in the official records of the County of Nassau, State of Florida affecting Real Property and more particularly described on said Mortgage referred to herein.

IN WITNESS WHEREOF, the undersigned has caused these presents to be executed on this date of 10/31/2008.

American Home Mortgage Acceptance, Inc.

Witness: Korell Harp

Linda Green
Vice President

Witness: Christina Huang

Pat Kingston
Asst. Vice President

State of GA
County of Fulton

On this date of 10/31/2008, before me, the undersigned authority, a Notary Public duly commissioned, qualified and acting within and for the aforementioned State and County, personally appeared the within named Linda Green and Pat Kingston, known to me (or identified to me on the basis of satisfactory evidence) that they are the Vice President and Asst. Vice President respectively of American Home Mortgage Acceptance, Inc., and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and in behalf of said corporation and that said corporation executed the same, and further signed and acknowledged that they had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

Witness my hand and official seal on the date hereinabove set forth.

Notary Public

Brittany Snow
NOTARY PUBLIC
Fulton County
State of Georgia
My Commission Expires
May 31, 2011

PLsnt-v03.0   08/19/2008   Copyright (c) 2008 by DOCX LLC



Like 71  G+1



Like  71 people like this. Sign Up to see what your friends like.



# PARKER & DuFRESNE
## ATTORNEYS AT LAW

**REAL FORECLOSURE LITIGATORS**
www.jaxlawcenter.com

AS SEEN ON:

Offices in Jacksonville, Florida

### Chain of title assessment workshop
### Fort Myers, Florida!

Learn all of the details about conducting
chain of title assessments!

with *Clouded Titles* author
**Dave Krieger**

#### FEATURING:

**DAVE KRIEGER**
Clouded Titles Author
*along with guest speakers!*

CLICK HERE TO ATTEND

 PENFED
CREDIT UNION

**Our 30-year fixed mortgage
is available with a 60-day
rate lock.**



3.875 %RATE      3.998 %APR

AT 0.250 POINTS      Rate valid as of 9/16/15

**LEARN MORE**

FLORIDA FORECLOSURE DEFENSE



HELP

Law Office of Kenneth Eric Trent, P.A.
"Foreclosure Destroyer"



ADVERTISE with us

contact us here

Archives

Select Month

Top Posts

What Is an Assignment of Mortgage?
by dinsfla

CLASS ACTIONS
by dinsfla

Sue Your Bank, Keep Your Home, Repeat

Statutes of Limitations for the 50 States (and the District of Columbia) | Know the time limits for filing a lawsuit (statutes of limitations) in your state.
by dinsfla

DEUTSCHE BANK V. CODIO | FORGED NOTE…MERS ASSIGNMENT "A Serious Problem" …whether the "certified" copy of the note annexed to the notice to admit was genuine, or whether the allonge was added to that copy of the note after it had been certified by Aegis
by dinsfla

re: Wall Street | "Corporations can only commit crimes through flesh-and-blood people." Sally Q. Yates, the deputy AG

Harris v. HSBC Bank, USA, NA | note's endorsement to the bank was undated…the assignment was "backdated"…factual issue of whether the note was assigned to the bank
by dinsfla

TFH | Enforcing Against Securitized Trusts the New Homeowners Bill of Rights and Wrongs: Ten Needed Strategies for Transitioning from Foreclosure Defense to Foreclosure Offense
by dinsfla

Officials Cover Up Housing Bubble's Scummy Residue: Fraudulent Foreclosure Documents

CFPB Finance & Services Complaints Center

JPMorgan Chase Bank, N.A. v Nola | mortgage voided because the power of attorney used at the closing was not properly initialed

Whats The Difference between a Mortgage & a Note?

SPEARS vs First American eAppraiseIT | Files on WaMu Appraisal Scheme Kept Sealed
by dinsfla

MERS et al v Johnston | MERS, MERSCORP'S DIVERSITY ARGUMENTS FAIL IN TRYING TO UPEND ANOTHER CALIFORNIA QUIET TITLE CASE!
by dinsfla

MERS 101
by dinsfla

Search

Search for: [                    ] [ Search ]

Please Support Me!

| Option 1 $10.00 ⊘ |

[ Add to Cart ]

Recent Comments

Kareem Salessi on Sue Your Bank, Keep Your Home, Repeat

Kareem Salessi on Sue Your Bank, Keep Your Home, Repeat

jessia bromberg on Wells Fargo Bank, N.A. v Ostiguy | NYSC – Motion to Reargue Denied …that the loan was transferred or sold or no longer belonged to Wells Fargo, and yet the Note remained it its possession.

Stupendous Man - Defender of Liberty, Foe of Tryanny on DEUTSCHE BANK V. CODIO | FORGED NOTE…MERS ASSIGNMENT "A Serious Problem" …whether the "certified" copy of the note annexed to the notice to admit was genuine, or whether the allonge was added to that copy of the note after it had been certified by Aegis

Kareem Salessi on City of Miami v. Wells Fargo & CO | 11th Cir. – engaged in a decade-long pattern of discriminatory lending in the residential housing market that caused the City economic harm…a claim arising under the Fair Housing Act (FHA), 42 U.S.C. 3601 et seq.,

Stupendous Man - Defender of Liberty, Foe of Tyranny on re: Wall Street | "Corporations can only commit crimes through flesh-and-blood people," Sally Q. Yates, the deputy AG

Stupendous Man - Defender of Liberty, Foe of Tyranny on re: Wall Street | "Corporations can only commit crimes through flesh-and-blood people," Sally Q. Yates, the deputy AG

Kareem Salessi on The Impact of Foreclosure Delay on U.S. Employment



All Of These Are Troll Comments

3,875,559 spam
blocked by Akismet

Fraud    Credit card offer    Executive hotel pacific seattle    Workshops    Swan    Reverse Mortgage         infolinks

© 2010-15 FORECLOSURE FRAUD | by DinSFLA. Powered by StopForeclosureFraud.



Privacy Policy
Disclaimer: Legal information is NOT legal advice. The material and historical information herein should NOT be taken as legal advice and is NOT a substitute for the assistance of a licensed advisor. I AM NOT AN ATTORNEY.

| Foreclosure Fraud | *Exhibit "A"* |

**Foreclosure Fraud in a Nutshell**

The untold story in the foreclosure crisis unfolding across America is that, following a foreclosure perpetrated by one of the October 2008 Bailout Banks (e.g. Bank of America, Citibank, JPMorgan, Wells Fargo) Fannie Mae or Freddie Mac suddenly appear as the record owner of Average Joe's home. These federal government sponsored entities then go into local housing court and get a court order authorizing them to evict Joe. If Joe resists, these supposedly charitable institutions obtain a writ ordering the local sheriff to forcibly remove Joe from his home.

Newt Gingrich recently admitted <u>to accepting $1.8 million from Freddie Mac</u> ($25,0000 to $30,000 a month during one span of time) for advising this proto-fascist entity. Gingrich claims that he supports Fannie and Freddie because he believes the federal government "should have programs to help low income people acquire the ability to buy homes." But Fannie and Freddie don't do this and never have. When government "helps" someone by subsidizing the purchase of something (through easy credit or lower-than-market rates), it makes that something more expensive. Helping someone buy something that is overpriced because of your help is not help. Fannie/Freddie subsidies not only hurt the low income people they intend to help, they hurt everyone by subsidizing, and therefore distorting, the entire housing market. Fannie/Freddie's charity has now taken a dark turn. Like their Depression-era New Deal predecessor the Regional Agricultural Credit Corp., Fannie/Freddie are now repossessing homes at an increasing and alarming rate.

Mr. Gingrich either does not understand economics – government subsidies make things more expensive, not less expensive, and therefore hurt their intended beneficiaries – or he is a vain, selfish, and cynical man with no interest in actually helping his neighbor.

You decide.

**THE OCTOBER 2008 BAILOUT PAID OFF THE HOLDERS OF MORTGAGE BACKED SECURITES AND DERIVATIVE INSUREDS**

The facts indicate that the <u>Federal Reserve "printed" at least 16 trillion dollars as part of the 2008 bailouts</u>. The bigger questions, however, who got it, why and what did the Fed get in return? The Fed doesn't just print money. It prints money to buy stuff. Most often this is U.S. Treasuries. That changed in October of 2008. In and after October 2008 the Fed printed new money to buy mortgage-backed securities (MBS) that were defaulting at a rapid rate. Want proof? Here is a link to the <u>Federal Reserve balance sheet</u> which shows that the Fed is holding over a trillion dollars in mortgage backed securities that it began acquiring in 2008.

Why is the Federal Reserve holding all these MBS? Because when "the market" collapsed in September of 2008, what really collapsed is the Fannie/Freddie/Wall Street mortgage "daisy chain" securitization scheme. As increasing numbers of MBS went into default, the purchasers of derivatives (naked insurance contracts betting on MBS default) began filing claims against the insurance writers (e.g. AIG) demanding payment. This started in February 2007 when HSBC Bank announced billions in MBS losses, gained momentum in June of 2007 when Bear Stearns announced $3.8 billion in MBS exposure in just one Bear Stearns fund, and further momentum with the actual collapse of Bear Stears in July and August of 2007. By September of 2008, the Bear Stearns collapse proved to be the canary in the coal mine as the claims on off-balance sheet derivatives became <u>the cascading cross defaults</u> that Alan Greenspan warned could collapse the entire Western financial system.

Part of what happened in October 2008 is that the Federal Reserve paid AIG's and others' derivative obligations to the insureds (pension funds, hedge funds, major banks, foreign banks) who held the naked insurance contracts guaranteeing Average Joe's payments. To understand this, imagine that a cataclysmic event occurred in the U.S. that destroyed nearly every car in the U.S. and further that Allstate insured all of these cars. That is what happened to AIG. When the housing market collapsed and borrowers began defaulting on their securitized loans, AIG's derivative obligations exceeded its ability (or willingness) to pay. So the Fed stepped in as the insurer of last resort and bailed out AIG (and probably others). When an insurer pays on a personal property claim, it has "<u>subrogation</u>" rights. This means when it pays it has the right to demand possession of the personal property it insured or seek recovery from those responsible for the loss. In Allstate's case this is wrecked cars. In the case of AIG and the Fed, it is MBS. That is what the trillions of MBS on the Fed's balance sheet represent: wrecked cars that Fannie and Freddie are now liquidating for scrap value.

Thank you Mr. Gingrich. Great advice.

**BUT FANNIE/FREDDIE WASN'T MY LENDER AND WASN'T MY MORTGAGEE, SO HOW CAN THEY TAKE MY HOUSE?**

To understand how it came to be that the Fed has paid Average Joe's original actual lender (the MBS purchaser) and now Fannie and Freddie are trying to take Joe's home, you first have to understand some mortgage law and securitization basics.

### The Difference Between Notes and Mortgages

When you close on the purchase of your home, you sign two important documents. You sign a promissory note that represents your legal obligation to pay. You sign ONE promissory note. You sign ONE promissory note because it is a negotiable instrument, payable "to the order of" the "lender" identified in the promissory note. If you signed two promissory notes on a $300,000 loan from Countrywide, you could end up paying Countrywide (or one of its successors) $600,000.

At closing you also sign a Mortgage (or a Deed of Trust in Deed of Trust States). You may sign more than one Mortgage. You may sign more than one Mortgage because it **does not represent a legal obligation to pay anything.** You could sign 50 Mortgages relating to your $300,000 Countrywide loan and it would not change your obligation. A Mortgage is a security instrument. It is security and security only. Without a promissory note, a mortgage is nothing. Nothing.

You "give" or "grant" a mortgage to your original lender as security for the promise to pay as represented by the promissory note. In real estate law parlance, you "give/grant" the "mortgage" to the "holder" of your "promissory note."

If you question my bona fides in commenting on the important distinction between notes and mortgages, I know what I am talking about. I tried and won perhaps the first securitized mortgage lawsuit ever in the country in *First National Bank of Elk River v. Independent Mortgage Services*, 1996 WL 229236 (Minn. Ct. App. No. DX-95-1919).

In FNBER v. IMS a mortgage assignee (IMS) claimed the ownership of two mortgages relating to loans (promissory notes) held by my client, the First National Bank of Elk River (FNBER). After a three-day trial where IMS was capably represented by a former partner of the international law firm Dorsey & Whitney, my client prevailed and the Court voided the recorded mortgage assignments to IMS. My client prevailed not because of my great skill but because it had actual, physical custody of the original promissory notes (payable to the order of my client) and had been "servicing" (receiving payments on) the loans for years notwithstanding the recorded assignment of mortgage. The facts at trial showed that IMS rejected the loans because they did not conform to their securitization parameters. In short, IMS, as the "record owner" of the mortgages without any provable connection to the underlying notes, had nothing. FNBER, on the other hand, had promissory notes payable to the order of FNBER but did not have "record title" to the mortgages. FNBER was the winner because its possession of and entitlement to enforce the notes made it the "legal owner" of the mortgages.

The lesson: if you have record title to a mortgage but cannot show that you have possession of and/or entitlement to enforce the promissory notes that the mortgage secures, you lose.

This is true for 62 million securitized loans.

### Securitization – The Car That Doesn't Go In Reverse

There is nothing per se illegitimate about securitization. The law has for a long time recognized the rights of a noteholder to sell off pro-rata interests in the note. So long as the noteholder remains the noteholder he has the right to exercise rights in a mortgage (take the house) when there is a default on the note. Securitization does not run afoul of traditional real estate and foreclosure law when the mortgage holder can prove his connection to the noteholder.

But modern securitization doesn't work this way.

The "securitization" of a "mortgage loan" today involves multiple parties but the most important parties and documents necessary for evaluating whether a bank has a right to foreclose on a mortgage are:

(1) the Borrower (Average Joe);

(2) the Original Lender (Mike's Baitshop and Mortgages or Bailey Savings & Loan – whoever is across the closing table from Joe);

(3) the Original Mortgagee (could be Mike's B&M, but could be anyone, including Fannie's Creature From the Black Lagoon, the mortgagee "nominee" MERS);

(4) the "Servicer" of the loan as identified in the PSA (usually a Bank or anyone with "servicer" in its name, the entity to whom Joe makes

his payments);

(5) the mortgage loan "pooling and servicing agreement" (PSA) and the PSA Trust created by the PSA;

(6) the "PSA Trust" is the "special purpose entity" created by the PSA. The PSA Trust is the heart of the PSA. It holds all securitized notes and mortgages and also sells MBS securities to investors; and

(7) the "Trustee" of the PSA Trust is the entity responsible for safekeeping of Joe's promissory note and mortgage and the issuer of MBS.

The PSA Servicer is essentially the Chief Operating Officer and driver of the PSA. Without the Servicer, the securitization car does not go. The Servicer is the entity to which Joe pays his "mortgage" (really his note, but you get it) every month. When Joe's loan gets "sold" multiple times, the loan is not actually being sold; the servicing rights are. The Servicer has no right, title or interest in either the promissory note or the mortgage. Any right that the Servicer has to receive money is derived from the PSA. The PSA, not Joe's Note or Joe's Mortgage, gives the Servicer the right to take droplets of cash out of Joe's monthly payments before distributing the remainder to MBS purchasers.

The PSA Trustee and the sanctity of the PSA Trust are vitally important to the validity of the PSA. The PSA promoters (the usual suspects, Goldman Sachs, Lehman Bros., Merrill, Deutchebank, Barclays, etc.) persuaded MBS purchasers to part with trillions of dollars based on the idea that they would ensure that Joe's Note would be properly endorsed by every person or entity that touched it after Joe signed it, that they would place Joe's Note and Joe's Mortgage in the vault-like PSA Trust and the note and mortgage would remain in the PSA Trust with a green-eyeshade, PSA Trustee diligently safekeeping them for 30 years. Further, the PSA promoters hired law firms to persuade the MBS purchasers that the PSA Trust, which is more than 100 percent funded (that is, oversold) by the MBS purchasers, was the real owner of Joe's Note and Joe's Mortgage and that the PSA Trust, using other people's money, had purchased or soon would purchase thousands of similar notes and mortgages in a "true sale" in accordance with FASB 140.

The PSA does not distribute pool proceeds that can be tracked pro rata to identifiable loans. In this respect, in the wrong hands (e.g. Countrywide's Angelo Mozilo) PSAs have the potential to operate like a modern "daisy chain" fraud whereby the PSA oversells the loans in the PSA Trust, thus defrauding the MBS investors. The PSA organizers also do not inform Joe at the other end of the chain that they have sold his $300,000 loan for $600,000 and that the payout to the MBS purchasers (and other derivative side-bettors) when Joe defaults is potentially multiples of $300,000.

The PSA organizers can cover the PSA's obligations to MBS purchasers through derivatives. Derivatives are like homeowners' fire insurance that anyone can buy. If everyone in the world can bet that Joe's home is going to burn down and has no interest in preventing it, odds are that Joe's home will burn down. This is part of the reason Warren Buffet called derivatives a "financial weapon of mass destruction." They are an off-balance sheet fiat money multiplier (the Fed stopped reporting the explosive expansion of M3 in 2006 most likely because of derivatives and mortgage loan securitization fraud), and create incentive for fraud. On the other end of the chain, Joe has no idea that the "Lender" across the table from him has no skin in the game and is more than likely receiving a commission for dragging Joe to the table.

A serious problem with modern securitization is that it destroys "privity." Privity of contract is the traditional notion that there are two parties to a contract and that only a party to the contract can enforce or renegotiate that contract. Put simply, if A and B have a contract, C cannot enforce B's rights against A (unless A expressly agrees or C otherwise shows a lawful agency relationship with B). The frustration for Joe is that he cannot find the other party to his transaction. When Joe talks to his "bank" (really his Servicer) and tries to renegotiate his loan, his bank tells him that a mysterious "investor" will not approve. He can't do this because they don't exist, have been paid or don't have the authority to negotiate Joe's loan.

Joe's ultimate "investor" is the Fed, as evidenced by the trillion of MBSs on its balance sheet. Although Fannie/Freddie purportedly now "own" 80 percent of all U.S. "mortgage loans," Fannie/Freddie are really just the Fed's repo agents. Joe has no privity relationship with Fannie/Freddie. Fannie, Freddie and the Fed know this. So they are using the Bailout Banks to frontrun the process – the Bailout Bank (who also have no cognizable connection to the note and therefore no privity relationship with Joe) conducts a fraudulent foreclosure by creating a "record title" right to foreclose and, when the fraudulent process is over, hands the bag of stolen loot (Joe's home) to Fannie and Freddie.

### Record Title and Legal Title

Virtually all 62 million securitized notes define the "Noteholder" as "anyone who takes this Note by transfer **and who is entitled to receive payment under this Note...**" Very few of the holders of securitized mortgages can establish that they both hold (have physical

possession of) the note AND are entitled to receive payments on the notes. For whatever reason, if a Bailout Bank has possession of an original note, it is usually endorsed payable to the order of some other (often bankrupt) entity.

If you are a Bailout Bank and you have physical possession of an original securitized note, proving that you are "entitled to receive payment" on the note is nearly impossible. First, you have to explain how you obtained the note when it should be in the hands of a PSA Trustee and it is not endorsed by the PSA Trustee. Second, even if you can show how you obtained the note, explaining why you are entitled to receive payments when you paid nothing for it and when the Fed may have satisfied your original creditors is a very difficult proposition. Third, because a mortgage is security for payments due to the noteholder **and only the noteholder**, if you cannot establish legal right to receive payments on the note but have a recorded mortgage all you have is "record" title to the mortgage. You have the "power" to foreclose (because courts trust recorded documents) but not necessarily the legal "right" to foreclose. Think FNBER v. IMS.

The "robosigner" controversy, reported by 60 Minutes months ago, is a symptom of the banks' problem with "legal title" versus "record title." The 60 Minutes reports shows that Bailout Banks are hiring 16 year old, independent contractors from Backwater, Georgia to pose as vice presidents and sign mortgage assignments which they "record" with local county recorders. This is effective in establishing the Bailout Banks' "record title" to the "mortgage." Unlike real bank vice presidents subject to Sarbanes-Oxley, Backwater 16-year olds have no reason to ask: "Where is the note?"; "Is my bank the noteholder?"; or "Is my Bank entitled to receive payments on the note?"

The Federal Office of the Comptroller of the Currency and the Office of Thrift Supervision agree with this analysis. In April of 2011 the OCC and OTS reprimanded the Bailout Banks for fraudulently foreclosing on millions of Average Joe's:

…without always ensuring that the either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time…

The OCC and OTS further found that the Bailout Banks "failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."

Finally, Bailout Banks consented to the OCC and OTS spanking by admitting that they have engaged in "unsafe and unsound banking practices."

In these "Order and Consent Decrees," the OCC and the OTS reprimanded all of the usual suspects: Bank of America, Citibank, HSBC, JPMorgan Chase, MetLife, MERSCorp, PNC Bank, US Bank, Wells Fargo, Aurora Bank, Everbank, OneWest Bank, IMB HoldCo LLC, and Sovereign Bank.

Although the OCC and OTS Orders are essentially wrist slaps for what is a massive fraud, these orders at least expose some truth. In response to the OCC Order, the Fannie/Freddie-created Mortgage Electronic Registration Systems (MERS), changed its rules (see Rule 8) to demand that foreclosing lawyers identify the "noteowner" prior to initiating foreclosure proceedings.

### NEWT'S FANNIE/FREDDIE ENDGAME: PLANTATION USA

Those of us fighting the banks began to see a disturbing trend starting about a year ago. Fannie and Freddie began showing up claiming title and seeking to evict homeowners from their homes.

The process works like this, using Bank of America as an example. Average Joe had a securitized loan with Countrywide. Countrywide, which might as well have been run by the Gambino family with expertise in "daisy chain" fraud, never followed the PSA, did not care for the original notes and almost never deposited the original notes in the PSA Trust. Countrywide goes belly up. Bank of America (BOA) takes over Countrywide in perhaps the worst deal in the history of corporate America, acquiring more liabilities than assets. Bank of America realizes that it has acquired a big bag of dung (no notes = no mortgages = big problem) and so sets up an entity called "BAC Home Loans LLP" whose general partner is another BOA entity.

The purpose of these BOA entities is to execute the liquidation the Countrywide portfolio as quickly as possible and, at the same time, isolate the liability to two small BOA subsidiaries. BOA uses BAC Home Loans LLP to conduct the foreclosure on Joe's home. BAC Home Loans LLP feeds local foreclosure lawyers phony, robosigned documents that establish an "of record" transfer of the Countrywide mortgage to BAC Home Loans LLP. BAC Home Loans LLP, "purchases" Joe's home at a Sheriff's sale by bidding Joe's debt owed to Countrywide. BAC Home Loans LLP does not have and cannot prove any connection to Joe's note so BAC Home Loans LLP quickly deeds Joe's property to Fannie and Freddie.

When it is time to kick Joe out of his home, Fannie Mae shows up in the eviction action. When compelled to show its cards, Fannie will

claim title to Joe's house via a "quit claim deed" or an assignment of the Sheriff's Certificate of sale. Adding insult to injury, while Joe may have spent years trying to get BOA to "modify" his loan, and may have begged BOA for the right to pay BOA $1000 a month if only BOA will stop the foreclosure, Fannie now claims that BOA deeded Joe's property to Fannie for nothing. That right, nothing. All county recorders require that a real estate purchaser claim how much they paid for the property to determine the tax value. Fannie claims on these recorded documents that it paid nothing for Joe's home and, further, falsely claims that it is exempt because it is a US government agency. It isn't. It is a government sponsored entity that is <u>currently in conservatorship and run by the US government</u>.

Great advice Newt.

## CONCLUSION

It is apparent that the US government is so broke that it will do anything to pay its bills, including stealing Average Joe's home.

That's change that both Barack Obama and Newt Gingrich can believe in.

## APPENDIX

More and more courts are agreeing that the banks "inside" the PSA do not have legal standing (they have no skin in the game and so cannot show the necessary "injury in fact"), are not "real parties in interest" (they cannot show that they followed the terms of the PSA or are otherwise "entitled to enforce" the note) and that there are real questions of whether any securitized mortgage can ever be properly perfected.

The banks' weakness is exposed most often in bankruptcy courts because it is there that they have to show their cards and explain how they claim a legal right, rather than the "of record" right, to foreclose the mortgage. More and more courts are recognizing that, without proof of ownership of the underlying note, holding a mortgage means nothing.

The most recent crack in the Banks's position is evidenced by the federal Eight Circuit Court of Appeals' decision in *In Re Banks*, No. 11-6025 (8th Cir., Sept. 13, 2011). In *Banks*, a bank attempted to execute a foreclosure within a bankruptcy case. The bank had a note payable to the order of another entity; that is, the foreclosing bank was "Bank C" but had a note payable to the order of "Bank B" and endorsed in blank by Bank B. The bank, Bank C, alleged that, because the note was endorsed in blank and "without recourse," that it had the right to foreclose. The Court held that this was insufficient to show a sufficient chain of title to the note, reversed the lower court's decision and remanded for findings regarding when and how Bank C acquired the note.

*See also, In Re Aagard*, No. 810-77338-reg (Bankr. E.D.N.Y., Feb. 10, 2011) (Judge Grossman slams MERS as lacking standing, working as both principal and agent in same transaction, and exposes MERS' alleged principal US Bank as unable to produce or provide evidence that it is in fact the holder of the note); *In Re Vargas*, No. 08-17036SB (Bankr. C.D. Cal., Sept. 30, 2008) (Judge Bufford correctly applied rules of evidence and held that MERS could not establish right to possession of the 83-year old Mr. Vargas' home through the testimony of a low-level employee who had no foundation to testify about the legal title to the original note); *In Re Walker*, Bankr. E.D. Cal. No. 10-21656-E-11 (May 20, 2010) (holding that neither MERS nor its alleged principal could show that they were "real parties in interest" because neither could provide any evidence of the whereabouts of, much less legal title to, the original note); *Landmark v. Kesler*, 216 P.2d 158 (Kan. 2009) (in this case the Kansas Supreme Court provides the most cogent state court analysis of the problem created by securitization – the "splitting" of the note and the mortgage and the real party in interest and standing problems that the holder of the mortgage has when it cannot also show that it has clean and clear legal title to the note); *U.S. Bank Nat'l Ass'n v. Ibanez*, 941 NE 40 (Mass. 2011), (the Massachusetts Supreme Court denied two banks' attempts to "quiet title" following foreclosure because the banks' proffered evidence did not show ownership of the mortgages – or for that matter, the notes – prior to the Sheriff's sale); and *Jackson v. MERS*, 770 N.W.2d 489 (Minn. 2009) (this federal-gun-to-the-head – certified question from federal court asking for state court blessing of its already decided ruling – to the Minnesota Supreme Court is most notable for the courageous dissent of NFL Hall of Fame player and only popularly elected Justice Alan Page who opined that MERS should pound sand and obey state recording standards).

Translator

Copyright © 2011 Butler Liberty Law. All rights reserved                    **Butler Liberty Law theme by**

*Exhibit "B"*

## The Big Question:

## How can there be a declaration of default

## when the creditor is showing no default and no loss on its books?

I have been through the ringer myself, as the homeowner in the article linked above said about himself. We have a steady policy of the banks luring homeowners into default or luring them into deeper defaults. The reason is clear. They want the foreclosure — not the house and definitely not the money owed. As one BOA manager said "we are in the foreclosure business not the modification business." The facts are always the same: the homeowner is faced with two choices based upon the information that comes from the only source he or she knows about — the party claiming to own the loan or claiming the authority to service the loan. In nearly all cases neither representation is true.

The two choices are to find another way to get help from friends and relatives (i.e., forget about modification) or go into a default. The message is perfectly clear that the "customer representative" is inviting them to go into default. But they have a script that carefully avoids the direct words of "I am telling you to go into default." And so nearly all judges say that this is not illegal legal advice and not fraudulent misrepresentation, even though the homeowner is told that there is nobody else they can talk to about their loan.

Millions of homeowners were looking for modification rather than a free house — mostly on loans that had reset to unaffordable monthly payments that were not properly disclosed at closing and which should never have been approved by any legitimate underwriting process. In fact, such loans were never approved prior to the era of the illusion of securitization in the secondary markets where mortgage loans are bought and sold. Industry practices, rules and regulations preventing banks from approving loans in which it was obvious that some or all of the terms would be breached based upon current information. So if a borrower is approved for a mortgage with a teaser payment of $500 per month in a household that grosses $50,000 per year, it is obvious what will happen when the payment resets to $5,000 per month ($60,000 per year) — $10,000 more than their entire income.

The ONLY reason why such loans were approved is that the banks were not putting the bank at risk in such loans and were making money hand over fist in the "secondary" markets that were completely under the control of the same banks. They sold that loan as though the $5,000 per month would be paid — and even had ratings and insurance indicating that the loan was "low risk" when the bank knew for sure that default was imminent due to the reset of the amount of payments. And in fact, payments were made to the investor creditors just as expected —> but paid by the investment bank as "Servicer advances."

But were they really paying the certificate holders in REMIC Trusts? Yes, but they were paying investors out of their own money which was hijacked into a commingled slush fund. But since they were called "servicer advances" that are now being bundled as derivatives and sold to the same investors as securitized debt, it is the SERVICER who has a claim for the advanced money even though it wasn't their money that funded the "advances" which were really refunds out of the money paid by the investors themselves.

The banks created this scheme so that investors would remain ignorant that anything was wrong with the portfolio despite mountains of delinquencies that were DECLARED BY THE SERVICER to be "defaults." And so the investors would buy more "mortgage backed" securities they were neither mortgage backed nor securities because the Trust never saw a penny of the offering of mortgage backed bonds and never operated nor purchased nor received ownership of the loans.

Those "advances" or refunds or whatever you want to call them can be "recovered" (I would say stolen) by the investment banks masquerading as the Master Servicer of a REMIC Trust that existed only on paper and not in the real world. But they can only "recover" those advances (that they are quickly selling to investors through new securitization schemes) if the property goes into foreclosure. If the property is foreclosed then the servicer no longer needs to make advances although in many cases it continues to do so in order to keep the investors in the dark. But more importantly it is ONLY when the property is sold that the "Master Servicer" can "recover" those servicer advances.

It's complicated. But if you stop for a moment and put pencil to paper suddenly the reason for those long delays in prosecuting foreclosures becomes crystal clear. The investment bank is using the investor money to make "advances" to the investor to make good on the expectations of the investor in receiving income from their "investment." Since the investment bank is not

actually making the advances, the "receivable" due to the investment bank under this convoluted scheme increases with each passing month (without any corresponding liability or expense). So the investment bank that controls the slush fund where investor money is kept, makes payments to the investor for the amounts due regardless of whether the borrowers are paying.

In the example above, they want to keep that time running as long as possible. By making advances of $5,000 per month, that is $60,000 per year and over an 8 year period, for example, the receivable is now $480,000 without the bank having to spend one dime and in fact, actually collecting fees during the entire time at a premium rate for those loans that are distressed. So they have a $480,000 asset waiting. But there is a catch. They can only get the $480,000 if the property is foreclosed and the property is sold. It is only out of the sale proceeds that the bank as "master Servicer" can lay claim for its $480,000. Of course in the end the investors get screwed because that $480,000 was their money and THEY should have received it. But they didn't and they don't. Just read the prospectuses on the bundling of "servicer advances."

So Wells Fargo and other banks adopted strategies that lure homeowners into default and get them believing and hoping they will get a modification when in fact they don't give the modifications at all. In truth they are neither authorized to collect the money nor enforce the obligation because their so-called authority comes from the PSA for a REMIC Trust that was never used, never funded, never in operation. And they do it in a variety of ways—

— Neil Franklin Garfield,
attorney (Florida)

# Livinglies's Weblog

# Statutory Requirements for Enforcement of Note or Mortgage

Posted on March 19, 2015 by Neil Garfield
For further information please call 954-495-9867 or 520-405-1688

=======================

So many people sent me this short white paper that I don't know who to thank or even who wrote it. Any help would be appreciated so I can edit this article and give attribution to the writer.

The only thing that I would caution is that eventually, perhaps sometime soon, the importance of the Assignment and Assumption Agreement will rise in importance as to these enforcement actions based upon a fictitious closing, debt, note and mortgage. The A&A is an agreement between the "originator" and some other "aggregator conduit".

The A&A essentially calls for violation of TILA by not disclosing the existence of a third party lender. It also allows for compensation and profits arising from the signature of the borrower on the settlement documents without disclosure of who received that compensation or made those profits and how much they were "earning."

Whether this is ultimately determined to be a table funded loan or simply not a loan contract at all with the borrower remains to be seen. If it is determined to be a table funded loan with an undisclosed third party lender who is not even the aggregator in the A&A then according to regulations Z it is "predatory per se." If it is predatory per se then how can anyone seek enforcement in equity (i.e. foreclosure)?

And while I am at it, to answer the question of many judges — "what difference does it make where the money came from? — ASK THE BANKS. They nearly always demand to see the bank account from which the down payment is being made and even going beyond that to require the borrower to prove that the money is the money of the borrower. If normal underwriting requires the borrower to produce proof of funding then why isn't the bank required to prove that they funded the loan — either by origination or acquisition or both?

If a borrower gets the down payment from his Uncle Joe because he is in fact broke, then the Bank under normal underwriting circumstances won't approve the loan. If a Bank has no financial stake in the alleged "loan" then why should THEY be allowed to enforce it? Isn't that highly prejudicial to the real creditors? Isn't the foreclosure judge making it harder for the real creditors to collect by entering judgment for a party who has no risk, no financial stake and no contractual right (or obligations) to represent the real creditor.

And lastly is the _wrong assumption about the chronology of these transactions. The mortgage backed securities were "sold forward," which is to say there was nothing in the Trust when they were sold — and as it turns out in most cases the Trust never got any loans. Further the notes and mortgages were also sold forward in a cloudy arrangement in which the ownership and balance due was at least in doubt if not unknown. You must remember that the banks were not in the business of loaning money — they were in the business of selling mortgage backed securities for empty trusts and then using the money any way they chose._

All that said the following was received by me from several people and I agree with virtually all of it.

========================

**Statutory Requirements For Establishing The Right To Enforce An Instrument**

1. Prove status of **holder** of the instrument. (UCC § 3-301(i)); or

2. Prove status of **non-holder in possession of the instrument** who has the **rights of a holder**. (UCC § 3-301(ii)); or

3. Prove status of being **entitled to enforce the instrument as a person not in possession of the instrument pursuant to UCC § 3-309** or UCC § 3-418(d). (NOTE is lost, stolen, destroyed).

**UCC § 3-309, requirements.**

a. Prove possession of the instrument and entitled to enforce it when loss of possession occurred. **(UCC § 3-309(a)(1)).**

i. If illegality or fraud were involved in the original transaction, it cannot be proved that the person is entitled to enforce the instrument.(See **UCC § 3-305. DEFENSES**)

b. Prove non-possession of the NOTE is NOT the result of a transfer. (**UCC § 3-309(a)(2)**).

*NOTE: If discovery shows that the instrument was sold by the person claiming the right to enforcement, a transfer occurred, and such person is NOT entitled to enforce the instrument. (See* **UCC § 3-309(a) (ii)**).

c. Prove that the person seeking enforcement cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. (**UCC § 3-309(a)(3)**).

*NOTE: If discovery shows that the instrument was sold by the person claiming the right to enforcement, a transfer occurred, and such person is NOT entitled to enforce the instrument. (See* **UCC § 3-309(a) (ii)**).

d. A person seeking enforcement of an instrument under subsection (a) **must prove the terms of the instrument and the person's right to enforce the instrument.** (UCC § 3-309(b)).

*****************

**UCC § 3-309 Enforcement Of Lost, Destroyed, Or Stolen Instrument.**
(a) A person not in possession of an instrument is entitled to enforce the instrument if

(1) the person seeking to enforce the instrument
(A) was **entitled to enforce the instrument when loss of possession occurred**, or
(B) has directly or indirectly acquired ownership of the instrument from a person who was **entitled to enforce the instrument when loss of possession occurred**;
(2) the **loss of possession was NOT the result of a transfer by the person** or a lawful seizure; and
(3) the person cannot reasonably obtain possession of the instrument because the instrument

was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. (b) **A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument.** If that proof is made, Section 3-308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument. (**UCC § 3-203(a)**).

If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this Article and has only the rights of a partial assignee. (**UCC 3-203(d)**).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

If the bank, mortgage company, etc., sold the NOTE, they have no right to enforce the NOTE, through foreclosure or court proceeding pursuant to the fact that the UCC bars such claimant from invoking the court's subject matter jurisdiction of the case.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Even if the claimant produces the original wet-ink NOTE, there is a defense to the action pursuant to UCC 3-305.

Illegality and false representation (fraud) perpetrated in the transaction.

Did the bankdisclose the SOURCE of the money for the transaction?Did the bank inform the NOTE issuer that the money for the transaction was provided at no cost to the bank?

Did the bank disclose that the NOTE would be sold at the earliest possible convenience, and that such sale and receipt of money from a third party would actually pay off the NOTE? (Satisfaction of Mortgage).

Many discovery questions to be asked when a claimant initiates foreclosure proceedings.

\*\*\*\*\*\*\*\*\*\*\*

Many assume that the bank/broker/lender that begins the process is actually providing the money for making a "loan," when in fact, the bank/broker/lender is only making an "exchange," of notes, at no cost, and then, coercing the issuer of the promissory note into the comprehension that he is receiving a "loan." The following was stated in **A PRIMER ON**

MONEY, SUBCOMMITTEE ON DOMESTIC FINANCE, COMMITTEE ON BANKING AND CURRENCY, HOUSE OF REPRESENTATIVES, 88th Congress, 2d Session, AUGUST 5, 1964, CHAPTER VIII, HOW THE FEDERAL RESERVE GIVES AWAY PUBLIC FUNDS TO THE PRIVATE BANKS [44-985 O-65-7, p89]

"In the first place, one of the major functions of the private commercial banks is to create money. A large portion of bank profits come from the fact that the banks do create money. And, as we have pointed out, **banks create money without cost to themselves**, in the process of lending or investing in securities such as Government bonds."

In this instance, the transaction was funded by using the prospective property (collateral) and the signer's promissory note as if the property and the Note already belonged to the bank/broker/lender. [Editor's note: Those loans NEVER belonged to the Bank who was selling them before they even existed.]

So, if the bank used the promissory NOTE, as money, to create the cash reserve which was then used to validate the bank check issued on the face amount of the promissory NOTE, at no cost to the bank, without NOTICE to the signer of the promissory NOTE, and without fully disclosing these facts and aspects of the transaction, the bank committed a DECEPTIVE PRACTICE, FRAUD.

Filed under: AMGAR, evidence, foreclosure, foreclosure defenses, Investor, MBS TRUSTEE, Mortgage, Title, TRUST BENEFICIARIES | Tagged: article 9 UCC, Assignment and ASsumption Agreement, enforcement of debt, enforcement of mortgage, enforcement of note, lost note, UCC | 30 Comments »

# Securitization for Lawyers: How it was Written by Wall Street Banks

Posted on September 3, 2014 by Neil Garfield
*For more information on foreclosure offense, expert witness consultations and foreclosure defense please call 954-495-9867 or 520-405-1688. We offer litigation support in all 50 states to attorneys. We refer new clients without a referral fee or co-counsel fee unless we are retained for litigation support. Bankruptcy lawyers take note: Don't be too quick admit the loan exists nor that a default occurred and especially don't admit the loan is secured. FREE INFORMATION, ARTICLES AND FORMS CAN BE FOUND ON LEFT SIDE OF THE BLOG. Consultations available by appointment in person, by Skype and by phone.*

---

Continuing with my article THE CONCEPT OF SECURITIZATION (https://livinglies.wordpress.com/2014/09/02/securitization-for-lawyers/) from yesterday, we have been looking at the CONCEPT of Securitization and determined there is nothing

theoretically wrong with it. That alone accounts for tens of thousands of defenses" raised in foreclosure actions across the country where borrowers raised the "defense" securitization. No such thing exists. Foreclosure defense is contract defense — i.e., you need to prove that in your case the elements of contract are absent and THAT is why the note or the mortgage cannot be enforced. Keep in mind that it is entirely possible to prove that the mortgage is unenforceable even if the note remains enforceable. But as we have said in a hundred different ways, it does not appear to me that in most cases, the loan contract ever existed, or that the acquisition contract in which the loan was being "purchased" ever occurred. But much of THAT argument is left for tomorrow's article on Securitization as it was practiced by Wall Street banks.

So we know that the concept of securitization is almost as old as commerce itself. The idea of reducing risk and increasing the opportunity for profits is an essential element of commerce and capitalism. Selling off pieces of a venture to accomplish a reduction of risk on one ship or one oil well or one loan has existed legally and properly for a long time without much problem except when a criminal used the system against us — like Ponzi, Madoff or Drier or others. And broadening the venture to include many ships, oil wells or loans makes sense to further reduce risk and increase the likelihood of a healthy profit through volume.

Syndication of loans has been around as long as banking has existed. Thus agreements to share risk and profit or actually selling "shares" of loans have been around, enabling banks to offer loans to governments, big corporations or even little ones. In the case of residential loans, few syndications are known to have been used. In 1983, syndications called securitizations appeared in residential loans, credit cards, student loans, auto loans and all types of other consumer loans where the issuance of IPO securities representing shares of bundles of debt.

For logistical and legal reasons these securitizations had to be structured to enable the flow of loans into "special purpose vehicles" (SPV) which were simply corporations, partnerships or Trusts that were formed for the sole purpose of taking ownership of loans that were originated or acquired with the money the SPV acquired from an offering of "bonds" or other "shares" representing an undivided fractional share of the entire portfolio of that particular SPV.

The structural documents presented to investors included the Prospectus, Subscription Agreement, and Pooling and Servicing Agreement (PSA). The prospectus is supposed to disclose the use of proceeds and the terms of the payback. Since the offering is in the form of a bond, it is actually a loan from the investor to the Trust, coupled with a fractional ownership interest in the alleged "pool of assets" that is going into the Trust by virtue of the Trustee's acceptance of the assets. That acceptance executed by the Trustee is in the Pooling and Servicing Agreement, which is an exhibit to the Prospectus. In theory that is proper. The problem is that the assets don't exist, can't be put in the trust and the proceeds of sale of the Trust mortgage-backed bonds doesn't go into the Trust or any account that is under the authority of the Trustee.

The writing of the securitization documents was done by a handful of law firms under the direction of a few individual lawyers, most of whom I have not been able to identify. One of them is located in Chicago. There are some reports that 9 lawyers from a New Jersey law firm resigned rather than participate in the drafting of the documents. The reports include emails from the 9 lawyers saying that they refused to be involved in the writing of a "criminal enterprise."

I believe the report is true, after reading so many documents that purport to create a securitization scheme. The documents themselves start off with what one would and should expect in the terms and provisions of a Prospectus, Pooling and Servicing Agreement etc. But as you read through them, you see the initial terms and provisions eroded to the point of extinction. What is left is an amalgam of options for the broker dealers selling the mortgage backed bonds.

**The options all lead down roads that are absolutely opposite to what any real party in interest would allow or give their consent or agreement. The lenders (investors) would never have agreed to what was allowed in the documents. The rating agencies and insurers and guarantors would never have gone along with the scheme if they had truly understood what was intended. And of course the "borrowers" (homeowners) had no idea that claims of securitization existed as to the origination or intended acquisition their loans. Allan Greenspan, former Federal Reserve Chairman, said he read the documents and couldn't understand them. He also said that he had more than 100 PhD's and lawyers who read them and couldn't understand them either.**

Greenspan believed that "market forces" would correct the ambiguities. That means he believed that people who were actually dealing with these securities as buyers, sellers, rating agencies, insurers and guarantors would reject them if the appropriate safety measures were not adopted. After he left the Federal Reserve he admitted he was wrong. Market forces did not and could not correct the deficiencies and defects in the entire process.

The REAL document is the Assignment and Assumption Agreement that is NOT usually disclosed or attached as an exhibit to the Prospectus. THAT is the agreement that controls everything that happens with the borrower at the time of the alleged "closing." See me on YouTube to explain the Assignment and Assumption Agreement. Suffice it to say that contrary to the representations made in the sale of the bonds by the broker to the investor, the money from the investor goes into the control of the broker dealer and NOT the REMIC Trust. The Broker Dealer filters some of the money down to closings in the name of "originators" ranging from large (Wells Fargo, Countrywide) to small (First Magnus et al). I'll tell you why tomorrow or the next day. The originators are essentially renting their names the same as the Trustees of the REMIC Trusts. It looks right but isn't what it appears. Done properly, the lender on the note and mortgage would be the REMIC Trust or a common aggregator. But if the Banks did it properly they wouldn't have had such a joyful time in the moral hazard zone.

The PSA turned out to be the primary document creating the Trusts that were creating primarily under the laws of the State of New York because New York and a few other states had a statute that said that any variance from the express terms of the Trust was VOID, not voidable. This gave an added measure of protection to the investors that the SPV would not be used for any purpose

other than what was described, and eliminated the need for them to sue the Trustee or the Trust for misuse of their funds. What the investors did not understand was that there were provisions in the enabling documents that allowed the brokers and other intermediaries to ignore the Trust altogether, assert ownership in the name of a broker or broker-controlled entity and trade on both the loans and the bonds.

The Prospectus SHOULD have contained the full list of all loans that were being aggregated into the SPV or Trust. And the Trust instrument (PSA) should have shown that the investors were receiving not only a promise to repay them but also a share ownership in the pool of loans. One of the first signals that Wall Street was running an illegal scheme was that most prospectuses stated that the pool assets were disclosed in an attached spreadsheet, which contained the description of loans that were already in existence and were then accepted by the Trustee of the SPV (REMIC Trust) in the Pooling and Servicing Agreement. **The problem was that the vast majority of Prospectuses and Pooling and Servicing agreements either omitted the exhibit showing the list of loans or stated outright that the attached list was not the real list and that the loans on the spreadsheet were by example only and not the real loans.**

Most of the investors were "stable managed funds." This is a term of art that applied to retirement, pension and similar type of managed funds that were under strict restrictions about the risk they could take, which is to say, the risk had to be as close to zero as possible. So in order to present a pool that the fund manager of a stable managed fund could invest fund assets the investment had to qualify under the rules and regulations restricting the activities of stable managed funds. The presence of stable managed funds buying the bonds or shares of the Trust also encouraged other types of investors to buy the bonds or shares.

But the number of loans (which were in the thousands) in each bundle made it impractical for the fund managers of stable managed funds to examine the portfolio. For the most part, if they done so they would not found one loan that was actually in existence and obviously would not have done the deal. But they didn't do it. They left it on trust for the broker dealers to prove the quality of the investment in bonds or shares of the SPV or Trust.

So the broker dealers who were creating the SPVs (Trusts) and selling the bonds or shares, went to the rating agencies which are quasi governmental units that give a score not unlike the credit score given to individuals. Under pressure from the broker dealers, the rating agencies went from quality culture to a profit culture. The broker dealers were offering fees and even premium on fees for evaluation and rating of the bonds or shares they were offering. They HAD to have a rating that the bonds or shares were "investment grade," which would enable the stable managed funds to buy the bonds or shares. The rating agencies were used because they had been independent sources of evaluation of risk and viability of an investment, especially bonds — even if the bonds were not treated as securities under a 1998 law signed into law by President Clinton at the behest of both republicans and Democrats.

Dozens of people in the rating agencies set off warning bells and red flags stating that these were not investment grade securities and that the entire SPV or Trust would fail because it had to fail. The broker dealers who were the underwriters on nearly all the business done by the rating agencies used threats, intimidation and the carrot of greater profits to get the ratings they wanted. and responded to threats that the broker would get the rating they wanted from another rating

agency and that they would not ever do business with the reluctant rating agency ever again — threatening to effectively put the rating agency out of business. At the rating agencies, the "objectors" were either terminated or reassigned. Reports in the Wal Street Journal show that it was custom and practice for the rating officers to be taken on fishing trips or other perks in order to get the required ratings that made Wall Street scheme of "securitization" possible.

This threat was also used against real estate appraisers prompting them in 2005 to send a petition to Congress signed by 8,000 appraisers, in which they said that the instructions for appraisal had been changed from a fair market value appraisal to an appraisal that would make each deal work. the appraisers were told that if they didn't "play ball" they would never be hired again to do another appraisal. Many left the industry, but the remaining ones, succumbed to the pressure and, like the rating agencies, they gave the broker dealers what they wanted. And insurers of the bonds or shares freely issued policies based upon the same premise — the rating from the respected rating agencies. And ultimate this also effected both guarantors of the loans and "guarantors" of the bonds or shares in the Trusts.

So the investors were now presented with an insured investment grade rating from a respected and trusted source. The interest rate return was attractive — i.e., the expected return was higher than any of the current alternatives that were available. Some fund managers still refused to participate and they are the only ones that didn't lose money in the crisis caused by Wall Street — except for a period of time through the negative impact on the stock market and bond market when all securities became suspect.

In order for there to be a "bundle" of loans that would go into a pool owned by the Trust there had to be an aggregator. The aggregator was typically the CDO Manager (CDO= Collateralized Debt Obligation) or some entity controlled by the broker dealer who was selling the bonds or shares of the SPV or Trust. So regardless of whether the loan was originated with funds from the SPV or was originated by an actual lender who sold the loan to the trust, the debts had to be processed by the aggregator to decide who would own them.

In order to protect the Trust and the investors who became Trust beneficiaries, there was a structure created that made it look like everything was under control for their benefit. The Trust was purchasing the pool within the time period prescribed by the Internal Revenue Code. The IRC allowed the creation of entities that were essentially conduits in real estate mortgages — called Real Estate Mortgage Investment Conduits (REMICs). It allows for the conduit to be set up and to "do business" for 90 days during which it must acquire whatever assets are being acquired. The REMIC Trust then distributes the profits to the investors. In reality, the investors were getting worthless bonds issued by unfunded trusts for the acquisition of assets that were never purchased (because the trusts didn't have the money to buy them).

The TRUSTEE of the REMIC Trust would be called a Trustee and should have had the powers and duties of a Trustee. But instead the written provisions not only narrowed the duties and obligations of the Trustee but actual **prevented both the Trustee and the beneficiaries from even inquiring about the actual portfolio or the status of any loan or group of loans**. The way it was written, the Trustee of the REMIC Trust was in actuality renting its name to appear as Trustee in order to give credence to the offering to investors.

There was also a Depositor whose purpose was to receive, process and store documents from the loan closings — except for the provisions that said, no, the custodian, would store the records. In either case it doesn't appear that either the Depositor nor the "custodian" ever received the documents. In fact, it appears as though the documents were mostly purposely lost and destroyed, as per the Iowa University study conducted by Katherine Ann Porter in 2007. Like the others, the Depositor was renting its name as though ti was doing something when it was doing nothing.

And there was a servicer described as a Master Servicer who could delegate certain functions to subservicers. And buried in the maze of documents containing hundreds of pages of mind-numbing descriptions and representations, there was a provision that stated the servicer would pay the monthly payment to the investor regardless of whether the borrower made any payment or not. The servicer could stop making those payments if it determined, in its sole discretion, that it was not "recoverable."

This was the hidden part of the scheme that might be a simple PONZI scheme. The servicers obviously could have no interest in making payments they were not receiving from borrowers. But they did have an interest in continuing payments as long as investors were buying bonds. THAT is because the Master Servicers were the broker dealers, who were selling the bonds or shares. Those same broker dealers designated their own departments as the "underwriter." So the underwriters wrote into the prospectus the presence of a "reserve" account, the source of funding for which was never made clear. That was intentionally vague because while some of the "servicer advance" money might have come from the investors themselves, most of it came from external "profits" claimed by the broker dealers.

The presence of  servicer advances is problematic for those who are pursuing foreclosures. Besides the fact that they could not possibly own the loan, and that they couldn't possibly be a proper representative of an owner of the loan or Holder in Due Course, the <u>actual creditor</u> (the group of investors or theoretically the REMIC Trust) never shows a default of any kind even when the servicers or sub-servicers declare a default, send a notice of default, send a notice of acceleration etc. What they are doing is escalating their volunteer payments to the creditor — made for their own reasons — to the status of a holder or even a holder in due course — despite the fact that they never acquired the loan, the debt, the note or the mortgage.

The essential fact here is that the only paperwork that shows actual transfer of money is that which contains a check or wire transfer from investor to the broker dealer — and then from the broker dealer to various entities including the CLOSING AGENT (not the originator) who applied the funds to a closing in which the originator was named as the Lender when they had never advanced any funds, were being paid as a vendor, and would sign anything, just to get another fee. The money received by the borrower or paid on behalf of the borrower was money from the investors, not the Trust.

So the note should have named the investors, not the Trust nor the originator. And the mortgage should have made the investors the mortgagee, not the Trust nor the originator. The actual note and mortgage signed in favor of the originator were both void documents because they failed to identify the parties to the loan contract. Another way of looking at the same thing is to say there was no loan contract because neither the investors nor the borrowers knew or understood what

was happening at the closing, neither had an opportunity to accept or reject the loan, and neither got title to the loan nor clear title after the loan. The investors were left with a debt that could be recovered probably as a demand loan, but which was unsecured by any mortgage or security agreement.

To counter that argument these intermediaries are claiming possession of the note and mortgage (a dubious proposal considering the Porter study) and therefore successfully claiming, incorrectly, that the facts don't matter, and they have the absolute right to prevail in a foreclosure on a home secured by a mortgage that names a non-creditor as mortgagee without disclosure of the true source of funds. By claiming legal presumptions, the foreclosers are in actuality claiming that form should prevail over substance.

Thus the broker-dealers created written instruments that are the opposite of the Concept of Securitization, turning complete transparency into a brick wall. Investor should have been receiving verifiable reports and access into the portfolio of assets, none of which in actuality were ever purchased by the Trust, because the pooling and servicing agreement is devoid of any representation that the loans have been purchased by the Trust or that the Trust paid for the pool of loans. Most of the actual transfers occurred after the cutoff date for REMIC status under the IRC, violating the provisions of the PSA/Trust document that states the transfer must be complete within the 90 day cutoff period. And it appears as though the only documents even attempted to be transferred into the pool are those that are in default or in foreclosure. The vast majority of the other loans are floating in cyberspace where anyone can grab them if they know where to look.

Filed under: AMGAR, bubble, CDO, CORRUPTION, discovery, escrow agent, evidence, expert witness, foreclosure, foreclosure defenses, GTC | Honor, investment banking, Investor, MBS TRUSTEE, MODIFICATION, Mortgage, Motions, Neil Garfield Show, originator, Pleading, securities fraud, Servicer, taxes, Title, TRUST BENEFICIARIES, trustee | Tagged: appraisals, Assignment and ASsumption Agreement, broker-dealer, CDO manager, closing agent, distribution reports, form over substance, guarantees, insurance, legal presumptions, Master Servicer, MBS, Mortgage, mortgage backed bonds, note, originator, Pooling and Servicing Agreement, Porter Study, Prospectus, ratings, REMIC, Reserve, SECURITIZATION DOCUMENTS, Servicer advances, title and securitization reports, trust, trustee | 6 Comments »

# Chase Slammed By CA Appellate Panel: Bank committed fraud in order to show ownership

Posted on July 16, 2014 by Neil Garfield
Housing Wire, Ben Lane (see link to article below): **"Bank committed fraud in order to show ownership."**

Exhibit "D"

# Livinglies's Weblog

# Securitization for Lawyers

Posted on September 2, 2014 by Neil Garfield

*For more information on foreclosure offense, expert witness consultations and foreclosure defense please call 954-495-9867 or 520-405-1688. We offer litigation support in all 50 states to attorneys. We refer new clients without a referral fee or co-counsel fee unless we are retained for litigation support. Bankruptcy lawyers take note: Don't be too quick admit the loan exists nor that a default occurred and especially don't admit the loan is secured. FREE INFORMATION, ARTICLES AND FORMS CAN BE FOUND ON LEFT SIDE OF THE BLOG. Consultations available by appointment in person, by Skype and by phone.*

**The CONCEPT of securitization does not contemplate an increase in violations of lending laws passed by States or the Federal government. Far from it. The CONCEPT anticipated a decrease in risk, loss and liability for violations of TILA, RESPA or state deceptive lending laws. The assumption was that the strictly regulated stable managed funds (like pensions), insurers, and guarantors would ADD to the protections to investors as lenders and homeowners as borrowers. That it didn't work that way is the elephant in the living room. It shows that the concept was not followed, the written instruments reveal a sneaky intent to undermine the concept. The practices of the industry violated everything — the lending laws, investment restrictions, and the securitization documents themselves. — Neil F Garfield, Livinglies.me**

---

"Securitization" is a word that provokes many emotional reactions ranging from hatred to frustration. Beliefs run the range from the idea that securitization is evil to the idea that it is irrelevant. Taking the "irrelevant" reaction first, I would say that comes from ignorance and frustration. To look at a stack of Documents, each executed with varying formalities, and each being facially valid and then call them all irrelevant is simply burying your head in the sand. On the other hand, calling securitization evil is equivalent to rejecting capitalism. So let's look at securitization dispassionately.

First of all "securitization" merely refers to a concept that has been in operation for hundreds of years, perhaps thousands of years if you look into the details of commerce and investment. In our recent history it started with "joint stock companies" that financed sailing expeditions for goods and services. Instead of one person or one company taking all the risk that one ship might not

come back, or come back with nothing, investors could spread their investment dollars by buying shares in a "joint stock company" that invested their money in multiple sailing ventures. So if some ship came in loaded with goods it would more than offset the ships that sunk, were pirated, or that lost their cargo. Diversifying risk produced more reliable profits and virtually eliminated the possibility of financial ruin because of the tragedies the befell a single cargo ship.

Every stock certificate or corporate or even government bond is the product of securitization. In our capitalist society, securitization is essential to attract investment capital and therefore growth. For investors it is a way of participating in the risk and rewards of companies run by officers and directors who present a believable vision of success. Investors can invest in one company alone, but most, thanks to capitalism and securitization, are able to invest in many companies and many government issued bonds. In all cases, each stock certificate or bond certificate is a "derivative" — i.e., it DERIVES ITS VALUE from the economic value of the company or government that issued that stock certificate or bond certificate.

In other words, securitization is a vehicle for diversification of investment. Instead of one "all or nothing" investment, the investors gets to spread the risk over multiple companies and governments. The investor can do this in one of two ways — either manage his own investments buying and selling stocks and bonds, or investing in one or more managed funds run by professional managers buying and selling stocks and bonds. Securitization of debt has all the elements of diversification and is essential to the free flow of commerce in a capitalistic economy.

Preview Questions:

- What happens if the money from investors is NOT put in the company or given to the government?
- What happens if the certificates are NOT delivered back to investors?
- What happens if the company that issued the stock never existed or were not used as an investment vehicle as promised to investors?
- What happens to "profits" that are reported by brokers who used investor money in ways never contemplated, expected or accepted by investors?
- Who is accountable under laws governing the business of the IPO entity (i.e., the REMIC Trust in our context).
- Who are the victims of misbehavior of intermediaries?
- Who bears the risk of loss caused by misbehavior of intermediaries?
- What are the legal questions and issues that arise when the joint stock company is essentially an instrument of fraud? (See Madoff, Drier etc. where the "business" was actually collecting money from lenders and investors which was used to pay prior investors the expected return).

In order to purchase a security deriving its value from mortgage loans, you could diversify by buying fractional shares of specific loans you like (a new and interesting business that is internet driven) or you could go the traditional route — buying fractional shares in multiple companies who are buying loans in bulk. The share certificates you get derive their value from the value of the IPO issuer of the shares (a REMIC Trust, usually). Like any company, the REMIC Trust

derives its value from the value of its business. And the REMIC business derives its value from the quality of the loan originations and loan acquisitions. Fulfillment of the perceived value is derived from effective servicing and enforcement of the loans.

All investments in all companies and all government issued bonds or other securities are derivatives simply because they <u>derive their value from something described on the certificate</u>. With a stock certificate, the value is derived from a company whose name appears on the certificate. That tells you which company you invested your money. The number of shares tells you how many shares you get. The indenture to the stock certificate or bond certificate describes the voting rights, rights to  distributions of income, and rights to distribution of the company is sold or liquidated. But this assumes that the company or government entity actually exists and is actually doing business as described in the IPO prospectus and subscription agreement.

The basic element of value and legal rights in such instruments is that there must be a company doing business in the name of the company who is shown on the share certificates — i.e., there must be actual financial transactions by the named parties that produce value for shareholders in the IPO entity, and the holders of certificates must have a right to receive those benefits. The securitization of a company through an IPO that offers securities to investors offer one additional legal fiction that is universally enforced — limited liability. Limited liability refers to the fact that the investment is at risk (if the company or REMIC fails) but the investor can't lose more than he or she invested.

Translated to securitization of debt, there must be a transaction that is an actual loan of money that is not merely presumed, but which is real. That loan, like a stock certificate, must describe the actual debtor and the actual creditor. An investor does not intentionally buy a share of loans that were purchased from people who did not make any loans or conduct any lending business in which they were the source of lending.

While there are provisions in the law that can make a promissory note payable to anyone who is holding it, there is no allowance for enforcing a non-existent loan except in the event that the purchaser is a "Holder in Due Course." The HDC can enforce both the note and mortgage because he has satisfied both Article 3 and Article 9 of the Uniform Commercial Code. The Pooling and Servicing Agreements of REMIC Trusts require compliance with the UCC, and other state and federal laws regarding originating or acquiring residential mortgage loans.

In short, the PSA requires that the Trust become a Holder in Due Course in order for the Trustee of the Trust to accept the loan as part of the pool owned by the Trust on behalf of the Trust Beneficiaries who have received a "certificate" of fractional ownership in the Trust. Anything less than HDC status is unacceptable. And if you were the investor you would want nothing less. You would want loans that cannot be defended on the basis of violation of lending laws and practices.

The loan, as described in the origination documents, must actually exist. A stock certificate names the company that is doing business. The loan describes the debtor and creditor. Any failure to describe the the debtor or creditor with precision, results in a failure of the loan contract, and the documents emerging from such a "closing" are worthless. If you want to buy a share of IBM you

don't buy a share of Itty Bitty Machines, Inc., which was just recently incorporated with its assets consisting of a desk and a chair. The name on the certificate or other legal document is extremely important.

In loan documents, the only exception to the "value" proposition <u>in the event of the absence of an actual loan</u> is another legal fiction designed to promote the free flow of commerce. It is called <u>"Holder in Due Course."</u> The loan IS enforceable in the absence of an actual loan between the parties on the loan documents, if a third party innocent <u>purchases</u> the loan documents <u>for value</u> in <u>good faith</u> and <u>without knowledge of the borrower's defense</u> of failure of consideration (he didn't get the loan from the creditor named on the note and mortgage). This is a legislative decision made by virtually all states — if you sign papers, you are taking the risk that your promises will be enforced against you even if your counterpart breached the loan contract from the start. The risk falls on the maker of the note who can sue the loan originator for misusing his signature but cannot bring all potential defenses to enforcement by the Holder in Due Course.

Florida Example:

673.3021   Holder in due course.—

(1)   Subject to subsection (3) and s. 673.1061 (http://www.leg.state.fl.us/Statutes/index.cfm?
App_mode=Display_Statute&Search_String=&URL=0600-
0699/0673/Sections/0673.1061.html)(4), the term "holder in due course" means the holder of
an instrument if:

(a)   The instrument when issued or negotiated to the holder does not bear such apparent
evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into
question its authenticity; and
(b)   The holder took the instrument:

1.   For value;
2.   In good faith;
3.   Without notice that the instrument is overdue or has been dishonored or that there is an
uncured default with respect to payment of another instrument issued as part of the same
series;
4.   Without notice that the instrument contains an unauthorized signature or has been altered;
5.   Without notice of any claim to the instrument described in s. 673.3061
(http://www.leg.state.fl.us/Statutes/index.cfm?
App_mode=Display_Statute&Search_String=&URL=0600-
0699/0673/Sections/0673.3061.html); and
6.   Without notice that any party has a defense or claim in recoupment described in s.
673.3051 (http://www.leg.state.fl.us/Statutes/index.cfm?
App_mode=Display_Statute&Search_String=&URL=0600-
0699/0673/Sections/0673.3051.html)(1).
673.3061   Claims to an instrument.—A person taking an instrument, other than a person
having rights of a holder in due course, is subject to a claim of a property or possessory right
in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the
instrument or its proceeds. A person having rights of a holder in due course takes free of the
claim to the instrument.
*This means that Except for HDC status, the maker of the note has a right to reclaim
possession of the note or to rescind the transaction against any party who has no rights to
claim it is a creditor or has rights to represent a creditor. The absence of a claim of HDC
status tells a long story of fraud and intrigue.*
673.3051   Defenses and claims in recoupment.—

(1)   Except as stated in subsection (2), the right to enforce the obligation of a party to pay an
instrument is subject to:

(a)   A defense of the obligor based on:

1.   Infancy of the obligor to the extent it is a defense to a simple contract;
2.   Duress, lack of legal capacity, or illegality of the transaction which, under other law,
nullifies the obligation of the obligor;

3.  Fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms;

*This means that if the "originator" did not loan the money and/or failed to perform underwriting tests for the viability of the loan, and gave the borrower false impressions about the viability of the loan, there is a Florida statutory right of rescission as well as a claim to reclaim the closing documents before they get into the hands of an innocent purchaser for value in good faith with no knowledge of the borrower's defenses.*

In the securitization of loans, the object has been to create entities with preferred tax status that are remote from the origination or purchase of the loan transactions. In other words, the REMIC Trusts are intended to be Holders in Due Course. The business of the REMIC Trust is to originate or acquire loans by payment of value, in good faith and without knowledge of the borrower's defenses. Done correctly, appropriate market forces will apply, risks are reduced for both borrower and lenders, and benefits emerge for both sides of the single transaction between the investors who put up the money and the homeowners who received the benefit of the loan.

It is referred to as a single transaction using doctrines developed in tax law and other commercial cases. Every transaction, when you think about it, is composed of numerous actions, reactions and documents. If we treated each part as a separate transaction with no relationship to the other transactions there would be no connection between even the original lender and the borrower, much less where multiple assignments were involved. In simple terms, the single transaction doctrine basically asks one essential question — if it wasn't for the investors putting up the money (directly or through an entity that issued an IPO) would the transaction have occurred? And the corollary is but for the borrower, would the investors have been putting up that money?  The answer is obvious in connection with mortgage loans. No business would have been conducted but for the investors advancing money and the homeowners taking it.

So neither "derivative" nor "securitization" is a dirty word. Nor is it some nefarious scheme from people from the dark side — in theory. Every REMIC Trust is the issuer in an initial public offering known as an "IPO" in investment circles. A company can do an IPO on its own where it takes the money and issues the shares or it can go through a broker who solicits investors, takes the money, delivers the money to the REMIC Trust and then delivers the Trust certificates to the investors.

Done properly, there are great benefits to everyone involved — lenders, borrowers, brokers, mortgage brokers, etc. And if "securitization" of mortgage debt had been done as described above, there would not have been a flood of money that increased prices of real property to more than twice the value of the land and buildings. Securitization of debt is meant to provide greater liquidity and lower risk to lenders based upon appropriate underwriting of each loan. Much of the investment came from stable managed funds which are strictly regulated on the risks they are allowed in managing the funds of pensioners, retirement accounts, etc.

By reducing the risk, the cost of the loans could be reduced to borrowers and the profits in creating loans would be higher. If that was what had been written in the securitization plan written by the major brokers on Wall Street, the mortgage crisis could not have happened. And if the actual practices on Wall Street had conformed at least to what they had written, the impact

would have been vastly reduced. Instead, in most cases, securitization was used as the sizzle on a steak that did not exist. Investors advanced money, rating companies offered Triple AAA ratings, insurers offered insurance, guarantors guarantees loans and shares in REMIC trusts that had no possibility of achieving any value.

Today's article was about the way the IPO securitization of residential loans was conceived and should have worked. Tomorrow we will look at the way the REMIC IPO was actually written and how the concept of securitization necessarily included layers of different companies.

Filed under: AMGAR, CORRUPTION, discovery, evidence, expert witness, Fannie MAe, foreclosure, foreclosure defenses, GTC | Honor, investment banking, Investor, MBS TRUSTEE, MODIFICATION, Mortgage, originator, Pleading, securities fraud, Servicer, STATUTES, Title, TRUST BENEFICIARIES, trustee Tagged: | Article 3 UCC, article 9 UCC, brokers, CERTIFICATES, Drier, Florida Statutes, fraud, HOLDER, holder in due course, insurance, IPO, joint stock companies, Madoff, Ponzi, ratings, recoupment, REMIC Trust IPO, rescission

« Holder in Due Course and Due Process From the Handbook of the Office of the Comptroller of the Currency »

*Exhibit E*

# Livinglies's Weblog

# LPS: So We Fabricated and Forged Documents... So what? Here's what!!

Posted on February 1, 2012 by Neil Garfield

## MOST POPULAR ARTICLES (../2011/06/15/2011/06/15/administrative/most-popular-articles/)

COMBO Title and Securitization Search, Report, Documents, Analysis & Commentary (http://stores.livinglies-store.com/-strse-23/COMBO-Title-and-Securitization/Detail.bok) **CLICK HERE TO GET COMBO TITLE AND SECURITIZATION REPORT (http://stores.livinglies-store.com/-strse-35/COMBO-Title-and-Securitization/Detail.bok)**

# IT'S ALL ABOUT THE MONEY, STUPID!

Editor's Analysis: This is the moment I have been waiting for. After years of saying the documents were real, they admit, in the face of a mountain of irrefutable evidence, that the documents were not real, but that as a convenience they should still be allowed to use them. Besides the obvious criminality and slander of tile and all sorts of other things that are attendant to these practices, there is a certain internal logic to their assertion and you should not dismiss it without thinking about it. Otherwise you will be left with your jaw hanging open wondering how an admitted criminal gets to keep the spoils of illegal activities.

I have been pounding on this subject for weeks because I could see in the motions being filed by banks and servicers that they had changed course and were now pursuing a new strategy that plays on the simple logic that you took a loan, you signed a note, you didn't make the payments as stated in the note — everything else is window dressing and for the various parties in securitization to sort amongst themselves.

All foreclosure actions are actually, when they boil them down, just collection actions. It is about money owed. So far, the arguments that have worked have been those occasions where the conduct of the Bank has been so egregious that the Judge wasn't going to let them have the money or the house even if they stood on their heads.

But to coordinate an attack on these foreclosures, you need to defeat the presumption that the collection effort is simple, that the homeowner didn't pay a debt that was due, and that the arguments concerning the forged, fabricated, fraudulent documents are paperwork issues that can be taken up with law enforcement or civil suits between the various undefined participants in the non-existent securitization chain.

Now we have LPS admitting false assignments. The question that must be both asked and answered by you because you have enough data and expert opinions to raise the material fact that there was a reason why the false paperwork was fabricated and forged and it wasn't because of volume. Start with the fact that they didn't have any problem getting the paperwork signed they wanted in the more than 100 million mortgage transactions "closed" during this mortgage meltdown period. Volume doesn't explain it.

Your first assertion should be payment and waiver because the creditor who loaned the money got paid and waived any remainder. You use the Securitization and title report from a credible expert who can back up what you are saying. That gets you past the motions to dismiss and into discovery, where these cases are won.

Your assertion should be that the paperwork was fabricated because there was no transaction to support the contents of any of the assignments. And from that you launch the basic attack on the loan closing itself. First, following the above line of reasoning, they used

the same tactics to create false paperwork at closing that identified neither the lender (contrary to the requirements of TILA and state lending statutes), nor ALL of the terms of the transaction, as contained in the prospectus and PSA given to investors.

But let us be clear. There are only two ways you can get out of a debt: (1) payment and (2) waiver. There isn't any other way so stop imagining that some forgery in the documents is going to give you the house. It won't. But if you can show payment or waiver or both, then you have a material issue of fact that completely or at least partially depletes the presumption of the Judge that you simply don't want to pay a legitimate debt from a loan you now regret.

Why are the terms of the securitization documentation important?

1. Because it was the investor who came up with the money and it was the borrower who took it. The money transaction was between the investors and the homeowners, with everyone else an intermediary or conduit.
2. It is ONLY the securitization documents that provide power or authority for the servicer or trustee to act as servicer or trustee of the mortgage backed security pool.
3. If the deal was between the investor who put up the money and the homeowner who took it, where are the documents between the investor and the homeowner? They can only exist if we connect the closing documents with the homeowner with the closing documents with the investor.
4. But if the transfer or assignment documents were defective, faulty, forged and fabricated, as well as fraudulent attempts to transfer bad loans into pools that investors said they would only accept good loans, then the there is nothing in the REMIC, there is no trust, there is no trustee of the pool and the servicer has authority to service nothing.
5. That breaks the connection between the so-called closing documents with the homeowner and the so-called closing documents with the investor. No connection means no nexus. No nexus means the investors have a claim arising from the fact that they loaned money but they don't get the benefit of a secured loan and they especially don't get anything unless THEY make the claim.
6. If the investors choose not to make the claim for collection or foreclosure, there is nothing anywhere in any law that allows an interloper to insert himself into the process and say that if the investor doesn't want it, I'll take it.
7. Your position should address the reality: appraisal fraud, deceptive lending practices, violations of TILA all contributed to the acceptance of a faulty loan product. But that isn't why your client doesn't owe the money. Your client does owe the money, but it has been paid to the creditor and the balance has been waived in the insurance and credit default swap contracts as well as the Federal bailouts.
8. The source of funding has been paid in whole or in part, they received the monthly payments even while they declared a default against your client homeowner, and they waived any right to pursue the rest from homeowners because they wish to avoid the exposure to defenses and affirmative defenses that the homeowner will  bring in the mortgage origination process.
9. The failure to identify the true creditor contrary to the requirements of law and the failure to describe in the note and mortgage the full terms of the loans creates a fatal

defect when applied to THIS case on its facts, which you will be able to prove if you are allowed to proceed in discovery.

10. Allowing interlopers into the process to pretend as though they were the mortgage lenders or successors leaves the homeowner with nobody to sue for offset, and no defenses to raise against a party who had nothing to do with either the investor or the homeowner in the closing with the investor wherein mortgage bonds were purchased, and the closing with the homeowner in which a portion of the funds collected were used to fund a loan to the homeowner.