1  Marshall Samuel Sanders, *Pro Se*
   Lydia Ong Sanders, *Pro Se*
2  1621 Kensing Lane
   Santa Ana, CA 92705-3074
3  Telephone: (714) 665-8012
   Facsimile: (714) 665-8012
4  E-mail: marshallssander@yahoo.com

5  Marshall S. Sanders and Lydia O. Sanders, Trustee(s), or any Successor Trustee(s) of the Marshall

6  and Lydia Sanders Trust Dated April 20, 1990, appearing as Trustees, *Pro Se*

7

8                   UNITED STATES DISTRICT COURT FOR THE

9         CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DIVISION-SANTA ANA

10

11  Marshall S. Sanders and Lydia O. Sanders,    )   Case No.: 8:15-cv-00935-AG-AS

12  Trustee(s) of the Marshall and Lydia Sanders  )   **UNILATERAL** STATUS REPORT
                                                   )
13  Trust Dated April 20, 1990,                    )
                                                   )   Date: September 21, 2015
14                   Plaintiff,                     )   Time: 9:00 a.m.
                                                   )   Courtroom: 10D
15          vs.                                     )
                                                   )   Trustee's Sale Date: September 22, 2015
16  Bank of America, N.A.; Wells Fargo Bank,       )   Trustee's Sale Time: 12:00 P.M.
                                                   )
17  N.A., as trustee, on behalf of the Harborview  )   Complaint Filed: June 11, 2015
                                                   )
18  Mortgage Loan Trust Mortgage Loan Pass-        )
                                                   )
19  Through Certificates, Series 2007-1; National  )
                                                   )
20  Default Servicing Corporation; Select          )
                                                   )
21  Portfolio Servicing, Inc.; and Does 1-20,      )
                                                   )
22                   Defendants.                    )
                                                   )
23

24

25

26

27

28

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD, THE CLERK OF THE COURT, AND THE DISTRICT COURT:**

In spite of representations made by Defendants to the Court in their "Joint" Status Report, particularly in regard to having met and conferred, those representations are false. Plaintiffs have unsuccessfully made attempts to settle and otherwise resolve this matter by offering Defendants a bona fide, face-to-face, settlement, or alternatively, immediate mediation, and if necessary, arbitration, including binding arbitration, but Defendants are bent on foreclosing, and this is made even more apparent by the way and the manner in which Defendants have conducted themselves throughout these proceedings, and more importantly, over the past eight (8) years. This refinance "loan" is not in default, Defendants lack standing to foreclose, the "loan" has been rescinded under the Truth-in-Lending Act, Defendants have already exercised their one-form-of-action and therefore are not entitled to have a *second*-form-of-action, to foreclose, the "loan" never consummated because the "lender" was actively concealed in violation of the Truth-in-Lending Act, furthermore, the "lender" purported to be "America's Wholesale Lender" which is a non-existent entity, the "refinance" loan was a victimization of Plaintiffs in that the secret intent of Defendant America's Wholesale Lender/Countrywide/Bank of America was to foreclose by contriving an engineered default when in fact Defendants used the manufactured default to cook their books into the stratosphere, "using" Plaintiffs home as the first piece in a series of forward sale contracts into the collateralized debt obligation world of derivatives where the real money, the big money, that Defendants could and would earn, and the only way they could earn it, was to declare a default when in fact there was no default, and then foreclose to cover up what is at the root a simple Ponzi scheme, albeit for stakes Mr. Ponzi could never have fathomed. Cystallized, Defendants used and unleashed a

weapon of mass financial destruction upon Plaintiffs, and the world, but it is only at the point of foreclosure that Defendants will collect the big money.

All of which is to say, that because Defendants lack standing to foreclose, Plaintiffs pray that the Court, although the instant Status Report is moot because Defendants' dual Motions to Dismiss will not take place, even so, Plaintiffs desire to advise the Court of the reason and purpose why Plaintiffs responded to Defendants' preparation and delivery to Plaintiffs of their "Joint" Status Report in that that report does not reflect, any of it, the fact that Plaintiffs do not agree, and cannot agree with Defendants, in regard to anything, but not because Plaintiffs are not willing but because Defendants have no motivation and thus no interest in avoiding foreclosure, for there are literally trillions of dollars in M3 notional derivatives at stake, and if Plaintiffs have their way with Defendants, the real truth will come out in Discovery, leading, hopefully, to repercussions of insolvency of Defendants. In other words, it is not possible that Defendants will do anything but foreclose regardless of representations to the contrary, if any, since to do so will collapse their empire. It would be preposterous for Plaintiffs to think that Defendants will make or take admissions or commissions against interests. There are trillions of dollars at stake for Defendants Bank of America and Wells Fargo Bank (Warren Buffett). The Sanders' have no prayer but to expose the facts, and then hope that political and financial "pull" of Defendants does not blind justice.

Because Defendants lack standing Plaintiffs submitted to Defendants the Joint Status Report with all text struck through. In its place, Plaintiffs respectfully submit to the Court the attached Unilateral Status Report.

The Court ought not to be weighed down by repetitions, redundancies, and histories, so this Unilateral Status Report will keep to the highlights and bottom line.

1. Because Defendants cannot act inimical to their interests, those interests being to protect a grand, global Ponzi-scheme using illegitimate securitization of mortgages as a foundational brick, then going out through "brokers" and originating "loans" and "refinances" that had long before been forward sold to investors, meaning, the "borrowers" did not even exist when the "Sponsors" matrixed "loans" that were not then in existence, yet raised billions of dollars from investors, which monies were intended to be pocketed, and were pocketed, by big banks, two of them being Defendants here, Bank of America and Wells Fargo Bank; all of which is to say that any "status report" provided to the Court by Defendants is disingenuous to the extreme while in stark contrast, Plaintiffs are doing everything within their abilities to simply give the Court all of the information pertinent to the small picture and the big picture so that, assuming the Court is not conflicted, meaning there is no financial dealings whatsoever between any interest(s) that the Court/Judge have with any of the Defendants, particularly but not exclusively of the interest (s) the Court's/Judge's pension fund(s) may have with any of the Defendants or their "affiliates," such that it could reasonably be charged that the Court is biased and thus cannot possibly be neutral or "blind" to any self-serving interest(s), but instead, it could be, and it would be reasonable to believe, that the Court/Judge in such an instance, if discovered, cannot possibly render any decision that will not be tainted and subject to reversal on appeal, and thus Plaintiffs plead with the Court/Judge to recuse immediately if in self-examination, Bank of America or Wells Fargo Bank, or any other Defendant now named, has loaned money to the Judge, holds the Judge's mortgage on any property of any kind as collateral for a loan of any kind made to the Judge, or holds pledged assets for any reason, or holds property in trust for another on behalf of the Judge, or otherwise has any interest in, or the Judge has an interest in, the financial well-being of Defendants such that a reasonable person, a man of the street, an ordinary "Joe" could not reasonably say, that the Judge was biased to the detriment of Plaintiffs herein. In this regard, an

immediate family member, particularly a spouse or domestic partner, constitutes for purposes of establishing a conflict of interest, the Judge himself.

That said, the following bullet points are intended to quickly show the Court the status of the case:

1. Discovery is intended near immediately. It is not Plaintiffs intention or desire to drag its feet.

2. As encouraged by the Court, Plaintiffs are diligently seeking Counsel, even pro bono Counsel.

3. Although the matter is in hot dispute, and although Plaintiffs believe with good cause that Defendants lack standing and have no nexus with the "refinance" at issue here, nevertheless, in order that Plaintiffs may move on with the affairs of life, Plaintiffs, in spite of their strongly held views in this matter, stand ready, willing, and able, to resolve their differences with Defendants "if" Defendants were similarly motivated, but the record, not just in the instant case, but nationwide and in every single case, have proven beyond a doubt, that no discovery, no settlement, no cooperation, will be given, up to and including, compelled discovery, and so, with that sad state of affairs in play here, there is no basis to report to the Court anything other than the matters at issue here are in hot dispute without any hope whatsoever of resolution short of a full-blown and lengthy trial after Discovery in which, as it was in 2010, Plaintiffs here demanding Discovery of all of Defendants' accounting records through naming Defendants' big-eight (at the time) accounting firms and attempting to discover exactly what consideration, if any, Defendants paid for Plaintiff's "debt."

4. Additional parties will necessarily be joined "if" discovery proves the necessity thereof.

5. Plaintiffs respectfully request appointment of a special master.

6. Plaintiffs respectfully request special accommodations because Mrs. Sanders is undergoing cancer treatment and therefore has special needs.

7. The Court has not been, and should have been, advised by Defendant Bank of America that it, Bank of America, "bookended" Plaintiffs by "buying up" their loan on their former home,

- 5 -
**UNILATERAL STATUS REPORT**

foreclosing simultaneously on that home as well as on the home that is the subject matter of the instant Complaint. In other words, Bank of America is putting pressure on Plaintiffs from two (2) entirely different directions, in what a reasonable person could describe as a "squeeze."

8. There is more here than meets the eye in regard to what may be an over-the-top bent on the part of Defendants to drive the Sanders' out of both of their homes (their other and former home of twenty-five years ["Iroquois"] is now occupied by the Sanders' disabled adult son/step-son and his wife).

9. Plaintiffs have made the same concerted, genuine and bona fide effort to solve any differences with Defendants as to both homes all to no avail. No less than the Chief Executive Officers of both Defendants Bank of America and Wells Fargo Bank, and non-defendant PNC Bank, publicly and for the record stated that they would fight any Plaintiff (referring to homeowners) house-by-house, and go to the mat, if necessary. Such "attitude" supports the loan modification and loss mitigation total failure of the big banks, Defendants here, to stop the foreclosure epidemic and aftermath.

10. So it is that Plaintiffs are before the Court not because they haven't tried every way to resolve the matter with Defendants, going back to 2008, more than two (2) years before bankruptcy became a last resort, and only at the last instant, to stop foreclosure, but according to the lips of Defendant Bank of America's CEO Brian Moynihan, whose deposition has been previously provided to the Court, we'll take on homeowners one by one if we have to (insinuating that you know what the result will be). Fear and intimidation are Mr. Moynihan's and Bank of America's tools of foreclosure, causing most foreclosures to morph into walk-aways because homeowners have lost heart, gone broke, or been ground-up fighting banks. Unlike the banks, homeowners don't get money printed for them for free courtesy of themselves (taxpayers) by way of the Federal Reserve, a private, for-profit corporation whose money comes to them courtesy of the printing capabilities of the United States Treasury, which prints and then lends to the Federal Reserve, at interest that the taxpayers pay, to

their constituent banks, not primarily in the United States but actually outside the United States (see Congressional Record and testimony of former Federal Reserve Chairman Ben Bernanke, in which he essentially told Senator Carl Levin when asked where he sent trillions of dollars to that had been printed up for him by the U.S. Treasury, that it went to banks outside the United States, but refused to name the banks. When pressed, Bernanke, by his response, in essence, told Levin to pound sand.

11. Plaintiffs cannot reasonably expect that the Court is going to change the world by its decision in this case, but it sure has a golden opportunity to "correct" injustice if only the Court will drill down deep enough, but it is just as important, even more important, that the Court will be able to recognize what comes up on the end of the drill, for the "material" may not be heretofore known, unlike fishing and reeling in, instead of a fish an old rubber boot. We all know what a boot looks like, but the carnage big banks and central banks have strewn across the globe, not just America, at bottom, is not even recognizable to the big banks and Defendants here in spite of the fact that it is they who engineered the weapons of financial mass destruction. See link below, and made, specifically an integral part of this status report for the purpose of demonstrating both the larger picture, but critically and pertinently, how that larger picture has badly injured the Sanders'.

See video here: https://www.khanacademy.org/economics-finance-domain/core-finance/derivative-securities/credit-default-swaps-tut/v/financial-weapons-of-mass-destruction $\overset{See}{\wedge} Exhibits\ A\text{-}E$

DATED: September 18, 2015

_____
Marshall S. Sanders, Trustee
*In Pro Per*

_____
Lydia O. Sanders, Trustee
*In Pro Per*

**UNILATERAL STATUS REPORT**

## CERTIFICATE OF SERVICE

BY PERSONAL DELIVERY OR ELECTRONIC MAIL OR U.S. MAIL (PRECISE METHOD INDICATED NEXT TO JUDGE OR PARTY OR COUNSEL)

I, the undersigned, state that I am a citizen of the United States, a resident of the County of Orange, State of California, and that I am over the age of eighteen (18) years and not a party to the within cause; and that my residence address is 1621 Kensing Lane, Santa Ana, California 92705-3074.

I am readily familiar with the mailing practice in my neighborhood for collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of daily affairs, correspondence is deposited with the United States Postal Service the same day it is submitted for mailing.  On September 18, 2015, I served a true copy of:

**UNILATERAL STATUS REPORT**

upon:

**Hon. Andrew J. Guilford, 411 W. Fourth St., Courtroom 10D, Santa Ana, CA 92701 (via the clerk's widow as instructed by court personnel)**
**Locke Lord, 300 S. Grand Avenue, Suite 2600, Los Angeles, CA 90071-3194:**
**csison@lockelord.com; sdelrahim@lockelord.com; aileen.ocon@lockelord.com**
**Adam Frederick Summerfield, McGuire Woods LLP, 1800 Century Park East, Suite 900, Los Angeles, CA asummerfield@mcguirewoods.com**

[XX] By Electronic Mail – serving the enclosed via e-mail transmission to each of the parties with an email address.

[ ] By U.S. Mail – by placing it for collection and mailing, in the course of ordinary business practice, with other correspondence, enclosed in a sealed envelope, with postage fully prepaid, addressed to all parties who do not have an email address.

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Santa Ana, California on September 18, 2015

Starr Sanders

*Exhibit A*

# Livinglies's Weblog

# Bank of America Ordered to Pay $1.2 BILLION for Fraudulent Mortgages

Posted on August 1, 2014 by Neil Garfield

**"Given the current environment where robo-signing became institutionalized as a practice even though it is the equivalent of forgery and where fabrication of documents by law offices and "document processors" were prepared according to a published menu of prices, why would anyone, least of all a court of law, apply general principles surrounding presumptions when established fact makes it more likely than not that the presumptions lead to the wrong conclusions? Where is the prejudice to anyone in abandoning these presumptions in light of all the information in the public domain?" — Neil Garfield, livinglies.me**

## THEY ACTUALLY CALLED IT "HUSTLE"

U.S. District Judge Jed Rakoff in Manhattan ruled nine months after jurors found Bank of America and former Countrywide executive Rebecca Mairone liable for defrauding government-controlled mortgage companies Fannie Mae (FNMA.OB) and Freddie Mac (FMCC.OB) through the sale of shoddy loans by the former Countrywide Financial Inc in 2007 and 2008.

The case centered on a mortgage lending process known as "High Speed Swim Lane," "HSSL" or "Hustle," and which ended before Bank of America bought Countrywide in July 2008.

Investigators said the program emphasized quantity over quality, rewarding employees for producing more loans and eliminating checkpoints designed to ensure the loans' quality. (see link below)

Now that an actual employee of the Bank has also been ordered to pay $1 Million, maybe others will start coming out of the woodwork seeking immunity for their testimony. There certainly has been a large exodus of employees and officers of Bank of America to other Banks and even other industries. They are all trying to distance themselves from the inevitable down fall of the Bank. Meanwhile the corrupt system is heavily engaged with financial news reporting. For every article pointing out that Bank of America might have hundreds of Billions of dollars in legal liabilities for their fraudulent practices in originating, acquiring, servicing and foreclosing mortgages, there

are five articles spread over the internet telling investors that BOA is a good investment and it is advisable to buy the stock. I know how that system works. For favors or money some people will write anything.

## THE BURDEN OF PLEADINGS AND PROOF MUST BE CHANGED

The question I continue to raise is that if there was an administrative finding of fraud by an agency of the government, which there was, and if there was a jury finding of fraud involved in the Countrywide mortgages (and other mortgages) why are we presuming in court that that the mortgage is valid?

I understand the statutory and common law presumptions arising out of certain instruments that appear to be facially valid. But I propose that lawyers challenge those presumptions based upon the widespread knowledge and information across the public domain that many if not most of the mortgages were procured by fraud, processed fraudulently, serviced fraudulently, and foreclosed fraudulently. In my opinion it is time for lawyers to challenge that presumption in light of the numerous studies, agency investigations and findings that the mortgages, from beginning to end, were fraudulently originated, acquired and processed.

Why should the filings of a pretender lender receive the benefit of the presumptions of validity just because it exists when we already know it is more likely than not that there are no underlying facts to support the presumptions — and knowing that there was probably fraud involved? Why should the burden remain on the borrowers who have the least access to the information about that fraud and who get nothing from the banks during discovery?

Forfeiture of the private residence of a person is the worst outcome of any civil litigation. It is like the death penalty in criminal litigation. Shouldn't it require intense scrutiny instead of a rocket docket that presumes the validity of the mortgage and note, and presumes that a possessor of a note (that more likely than not was fabricated and forged by a machine) has the right to enforce?

In a REAL transaction in the REAL world, the originator of a loan would demand that all underwriting restrictions be applied, and confirmation of the submissions by the borrower. If anyone was buying the loan in the secondary market, they would demand the same thing and proof that the assignor, endorser or transferor of the loan had title to it in every conceivable way.

The buyer would demand copies of the actual documentation so that they could enforce the loan. These documents would exist and be kept in a vault because the fate of the investment normally depends upon the ability of the "lender" or "purchaser" of the loan to prove that the loan was properly originated and transferred for value in good faith without knowledge of any defenses of the borrower.

In short, they would demand that they receive proof of all aspects in the chain of title such that they would be considered a Holder in Due Course.

Today, nobody seems to allege they are a holder in due course and nobody seems to want to identify any party as a Holder in Due Course or even a creditor. They use the term "holder" with its presumptions as a sword against the hapless borrower who doesn't have the information to

know that his or her loan is likely NOT owned by anyone in the chain claimed by the foreclosing party.

If it were otherwise, all foreclosure cases would end with a thud — the loan would be produced in all its glory with everything in its place and fully disclosed. The only defense left would be payment. Instead the banks are waiting years to run the statute on TILA rescission and TILA violations before they start actively prosecuting a foreclosure.

What bank with a legitimate claim for foreclosure would want to wait before it got its hands on the collateral for a loan in default? Incredibly, these delays which often amount to five years or more, are ascribed to borrowers who are "buying time" without looking at the docket to see that the delay is caused by the Plaintiff foreclosing party, not the borrower who has been actively seeking discovery.

What harm would there be to anyone who is a legitimate stakeholder in this process if we required the banks to plead and prove in all cases — judicial and nonjudicial — the following:

1. All closing documents with the borrower conformed with Federal and State law as to disclosures, Good Faith Estimate and appraisals.
2. Underwriting and due diligence for approval of the loan application was performed by [insert name of party].
3. The payee on the note loaned money to the borrower.
4. The mortgagee on the mortgage (or beneficiary on the deed of trust) was the source of funds for the loan.
5. The "originator" of the loan was the lender.
6. No investor or third party was the creditor, investor or lender at the closing of the loan.
7. Attached to the pleading are wire transfer receipts or canceled checks showing that the borrower received the funds from the party named on the settlement documents as the lender.
8. Each assignment in the chain of title to the loan was the result of a transaction in which the loan was sold by the owner of the loan for value in good faith without knowledge of borrower's defenses.
9. Each assignment in the chain of title to the loan was the result of a transaction in which the loan was purchased by a bona fide purchaser for value in good faith without knowledge of borrower's defenses.
10. Attached to the pleading are wire transfer receipts or canceled checks showing that the seller of the loan received the funds from the party named on the assignment or endorsement as the purchaser.
11. The creditor for this debt is [name the creditor]. The creditor has notice of this proceeding and has authorized the filing of this foreclosure [see attached authorization document].
12. The date of the purchase by the creditor Trust is [put in the date]. Attached to the pleading are wire transfer receipts or canceled checks showing that the seller of the subject loan received the funds from the REMIC Trust named in the pleadings as the purchaser.
13. The purchase by the Trust conformed to the terms and conditions of the Trust instrument which is the Pooling and Servicing Agreement [attached, or URL given where it can be accessed]
14. The Creditor's accounts show a deficiency in payments caused by the failure of the borrower

to pay under the terms of the note.

15. All payments received by the creditor (owner of the loan) have been posted whether received directly or received indirectly by agents of the creditor.

16. The creditor has suffered financial injury and has declared a default on its own account. [See attached Notice of Default].

17. The last payment received by the creditor from anyone paying on this subject loan account was [insert date].

When I represented Banks and Homeowner Associations in foreclosures against homeowners and commercial property owners, I had all of this information at my fingertips and could produce them instantly.

**Given the current environment where robo-signing became institutionalized as a practice even though it is the equivalent of forgery and where fabrication of documents by law offices and "document processors" were prepared according to a published menu of prices, why would anyone, least of all a court of law, apply general principles surrounding presumptions when established fact makes it more likely than not that the presumptions lead to the wrong conclusions? Where is the prejudice to anyone in abandoning these presumptions in light of all the information in the public domain?**

see http://thebostonjournal.com/2014/07/30/bank-of-america-ordered-to-pay-1-27-billion-for-countrywide-fraud/ (http://thebostonjournal.com/2014/07/30/bank-of-america-ordered-to-pay-1-27-billion-for-countrywide-fraud/)

For consultations, services, title and securitization reports, reviews and analysis please call 520-405-1688 or 954-495-9867.

About these ads
(http://en.wordpress.com/about-these-ads/)

CPR Call Blocker V202 -
Caller Display - 1200 ...
$149.99 **$89.90**

SENTRY Call Blocker,
Robocall Blocker ...
$79.99 **$39.00**

Filed under: AMGAR, CASES, CORRUPTION, discovery, Fannie MAe, foreclosure, foreclosure defenses, foreclosure mill, GTC | Honor, investment banking, Investor, MBS TRUSTEE, MODIFICATION, Mortgage, originator, Pleading, securities fraud, Servicer, STATUTES, Title, TRUST BENEFICIARIES, trustee Tagged: | assignment, Bank of America pays $ 1.2 Billion, burden of pleading, BURDEN OF PROOF, countrywide, creditor, discovery, fraud in origination of loan documents, fraud in sale of loan documents, legal presumptions, validity of an instrument

« FDCPA Actions Against Servicers — Listen to the Neil Garfield Show

# 40 Responses



**usedkarguy**, on August 2, 2014 at 11:10 pm said:
Tolle, I think Gene is a wrench thrower.



**usedkarguy**, on August 2, 2014 at 11:09 pm said:
Louise, I have three assignments and two notes! My full house beats your three-of-a-kind!



**usedkarguy**, on August 2, 2014 at 11:06 pm said:
I don't remember seeing a post on this settlement (link below). This one went right to the underwriting (or lack thereof) a.k.a. "due diligence" to be performed by the Securities Underwriter. It was non existent. See the exhibits and find your mortgage trust in there.

If the bond blew up leaving only a couple tranches (usually equity tranches held by the sponsor), doesn't that trigger event force the extinguishment the obligation to the Trustee? The borrower's OBLIGATION as well as the bank (see paragraph nine of your Fannie / Freddie note) is paid off by credit enhancement and swaps. There is no loss, there can be no claim. Especially without any recordation of title aka recorded assignment with an accompanying endorsement of the note (aka tranfer and delivery).

http://www.chicagotribune.com/business/breaking/chi-citi-mortgage-securities-settlement-20140714-story.html



**Deborah Wynn**, on August 2, 2014 at 8:47 pm said:
I'd estimate my odds are better than 10 percent , definitely better.: )



**Deborah Wynn**, on August 2, 2014 at 8:43 pm said:
Cookie you seem like a good soldier but when I know my case and I know what I would need from a lawyer who has say 100 cases at once I do understand the complexity – albeit as to what applies and what does not apply to my case where it and the strengths of my case where it is , now is not the time to turn it over trust me – no lawyer wants my case where it is now and they are not willing to work as hard as I do. aND I can't afford the kind of lawyer I would hire.



**mycookiejars**, on <u>August 2, 2014 at 6:23 pm</u> said:
Deb, the odds are only 10 percent of a former home owner reappearing and even less odds for them to get the house back. . Its an uphill battle. That's what we were told by our daughters attorney. You know I am rooting and praying for you. Its a catch 22 for me. You Fight the Good Fight! Win or Lose, just know that God has already Blessed you!



**The A Man**, on <u>August 2, 2014 at 5:33 pm</u> said:
I am thinking of hiring a Private Investigator It is cheaper than a lawyer. I just watched Giligans Island and Thurston Howell always finds dirt on his adversaries.

NEVER AGAIN



**<u>Deborah wynn</u>**, on <u>August 2, 2014 at 5:05 pm</u> said:
Cookie you may as well tell me to give up my baby at this point.



**mycookiejars**, on <u>August 2, 2014 at 4:29 pm</u> said:
Deb, I know you have been burned by lawyers. I myself didn't know the good guys from the bad guys. That makes it difficult. I had to Trust Someone, so do you. Back then the only fc attornies were those who did the fc. That's not the case anymore. Have an Expierenced Title, Estate, Mortgage review your pleadings.



**mycookiejars**, on <u>August 2, 2014 at 2:52 pm</u> said:
Some purchase both. The juglar n aeorta. Keep In Mind that Its gets messy and Funerals aren't Free. Hire an Attorney!



**mycookiejars**, on <u>August 2, 2014 at 2:47 pm</u> said:
Drum Roll Please. Dum da Dum Dum Dummmm. I forgot to end in this. "State Laws Vary". I can vouch for Neil on that one. Federal Laws are the same. Pick Your Poison.



**mycookiejars**, on <u>August 2, 2014 at 2:22 pm</u> said:
We don't except Whine and will not let you in if you show up with it, we don't like our Cheetos soggy . Just thought you should know that.



**mycookiejars**, on <u>August 2, 2014 at 2:07 pm</u> said:

Welcome to the Winners Circle Gene. Keep the debate clean. Or Neil will send you to the corner. Bring some Wine



**louise**, on August 2, 2014 at 1:56 pm said:

E.Tolle, Gene is some kind of a shill. Not sure which kind. However, back several months ago I begged to differ with him about the fact that there ARE NO LAWS on the books to mandate recordation of the transfers of real property/titles. He did not know or did not want to know there ARE laws all across the country with regard to proper recordation of transfer of title of real property, which only makes sense because all transfers need to be recorded to PREVENT FRAUD and theft. Thus, we have quite a few suits across the country against MERS for screwing up the titles to thousands/millions of properties.



**mycookiejars**, on August 2, 2014 at 12:38 pm said:

Deb, here is one to Top. About 20yrs back It was my responsibility to place the ads for the preschool. The gal at the local paper who typed up the ad mispelled nurturing. All the sudden we were in the business of neutering. I've never topped that one. LOL



**Deborah wynn**, on August 2, 2014 at 12:20 pm said:

That's great cookie I feel so much better about my typos now ha! ( believe me I've had worse iPhone word defaults. )



**mycookiejars**, on August 2, 2014 at 11:55 am said:

Ooopsy. Notary of the Public. Where is my spell checker? Oh My! Pubic? LOL!



**mycookiejars**, on August 2, 2014 at 11:46 am said:

Guilty only of being a bad speller.



**mycookiejars**, on August 2, 2014 at 11:45 am said:

FYI, National Signing Agent, Title Abstracter, n. Notary of the Pubic.



**mycookiejars**, on August 2, 2014 at 11:23 am said:

I did as my attorney advised. Althou BOA/BAC n I have a difference of opinion about that. Who do you think forges statements on Bank Letterhead, them or me? Hint! Not Me!



**mycookiejars**, on <u>August 2, 2014 at 11:10 am</u> said:
WB JG, Absolutely! As a NSA I caught on quick about the Forgery n lack of signing capicity as you did. Being ordered by Fidelity n LPS to do it their way or don't get paid pissed me off. I couldn't n wouldn't do it. But I couldn't figure out for the longest time WHY. Spreading the Risks was the intention, but Greed n the Lack of Regulation opened the door for the criminal enterprise. Legal My Gr'ass!! Fraud from begining to end. Sighhh!



**Deborah wynn**, on <u>August 2, 2014 at 10:31 am</u> said:
MERS is the banking industries making
Never would the people consider it safe practice. It's unsafe and it's damaging. expediency is no excuse. I want to know who died and made the banks king and country law makers regarding the recording system.



**Deborah wynn**, on <u>August 2, 2014 at 10:29 am</u> said:
MERS is the banking industries making
Never would the people consider it safe practice. It's unsafe and it's damaging. expiediency is no excuse. I want to know who died and made the banks king and country law makers regarding the recording system.



**johngault**, on <u>August 2, 2014 at 12:41 am</u> said:
Say "NO" to a Mers Mortgage.

MERS and securitization have to GO.



**E. ToLLe**, on <u>August 1, 2014 at 9:37 pm</u> said:
Gene, on July 30, 2014 at 8:30 pm said:

*NG,*

*"I am really beginning to wonder about your ability to understand the written word. What you write above is not what is going on with the PIMCO lawsuit.*

*PIMCO, etc, filed the lawsuit on a violation of Fiduciary Duty issues. Primarily, the claim is that the Trustees failed to exercise their FD to the Investors by not demanding repurchase of defective loans for Reps and Warranties violations.*

*Reps and Warranties violations do not mean that the loan is void, or the contract is void, nothing of the sort. It means that there are issues with potentially income or appraisal fraud, occupancy fraud, TILA/RESPA disclosure issues (minor infractions) and numerous other items. These do not void the loan."*

Whoa there cowboy! Minor infractions? Fraud, fraud, and more fraud? Are you actually allowed to take the stand in a court of law? Gheez!

Actually Gene, there are many aspects of fiduciary responsibilities or the lack thereof in this suit. As a matter of fact, one of the main avenues for this lawsuit is the fact that the banksters were using investor monies to cure predatory (fraudulent) loans, as seen here:

**Section 3.11 of the PSAs provides that "Countrywide may agree to a modification of any Mortgage Loan" in certain specified circumstances. The Holders do not seek to halt bona fide modifications of troubled loans for borrowers who need them (a point on which Neil Garfield has been outspoken). When, however, modifications are required to remedy predatory lending violations, Section2.03(c) of the PSAs requires that the offending seller of the mortgage bear the costs to "cure such breach in all material respects…." Nowhere do the PSAs permit the costs of curing predatory loans to be imposed on the Trusts or the Certificate holders. Despite these provisions, the Master Servicer has breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various Attorneys' General against its parent company while breaching its obligation to demand that the offending mortgage seller (its parent company) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the mortgage seller's obligation to cure predatory mortgages.**

**The Master Servicer has also unjustly enriched its parent company by using Trust collateral to settle claims that are not, and could never be, made against the Trusts, in a manner that has "materially and adversely affected the interest of the Certificateholders…"**

Yet another avenue for Wall Street to off-load its $$$ criminality. Why pay for anything so convoluted as to mystify MITers? So many elements of this suit are over a predatory issue, and contrary to your belief, fraud is fraud, no matter who the fraud's aimed at. Fraus omnia vitiate, or, "Fraud vitiates everything", whether it's tossed at trusts, mortgagees, or low-life mortgagors.

And btw, these aren't simple TILA and/or RESPA violations (as you referenced) Pimco's bitching about. Fiduciary duties can be some serious shit, As *IS* being called out in the Pimco etc., lawsuit. The following is from Gibbs & Bruns, Pimco etc's law firm) to Bank of New York and Bank of America (one and the same evil doers) over alleged breaches by Countrywide of its reps and warranties with respect to the servicing of the loans underlying its investments….

**- Failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;**

**– Failed to demand that sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered….**

I guess you're one of the few "experts" who haven't quite put two and two together as to why the banksters are having to file millions of fraudulent documents in courts across the land, and how that directly correlates to the real and present danger to life as we know it, when the

dirty little secret finally comes out of the closet, you know the one…that all the trusts are as empty as the witness chair you sit in.

Of course you don't have to believe me, or NG….there are plenty of high-ups that have acknowledged as much. Felix Salmon said, *"You thought the foreclosure mess was bad? You're right about that. But it gets so much worse (his perspective, not mine) once you start adding in a whole bunch of parallel messes in the world of mortgage bonds.*

*For instance, as Tracy Alloway says, mortgage-bond documentation generally says that if more than a minuscule proportion of notes in a mortgage pool weren't properly transferred, then the trustee for the bondholders can force the investment bank who put the deal together to repurchase the mortgages. And it's looking very much as though **none** of the notes were properly transferred.*

http://blogs.reuters.com/felix-salmon/2010/10/13/the-enormous-mortgage-bond-scandal/

Gene, remember a little bit about what's going on here….a quarter trillion dollars asked for in this one lawsuit isn't chump change, even for Wall Street. This could seriously implode the entire ball of waxy financials across the globe, more like dominoes on a shaky table. And yet you make it out like it's nothing….an extortion attempt? Are you fucking kidding me?

Obama decided that as long as it's only lowlife borrowers being adversely affected, the bubble over his head reads, "What, me worry?" Even if it is millions of so-called citizens losing their domiciles, better to serve the true constituents, the Wall Street campaign check-writers. Back to Salmon:

*"It also turns out that there's a pretty strong case that they lied to the investors in many if not most of these deals. I mentioned this back in September, and I've been doing a bit more digging since then. And I'm increasingly convinced that the risk to investment banks isn't only one of dodgy paperwork; there's also a serious risk of massive lawsuits from the SEC or other prosecutors, **as well as suits from individual mortgage investors."** (He wrote that back in 2010).*

Gene goes on to say, *"As for NG, if his arguments about the loans never going into the Trust are so great, why didn't PIMCO claim that? Of course, maybe their attorneys are not just as smart as NG."* Salmon touches on that as well….

*"….were the bond investors able to do their own due diligence on the loan pool? The answer is no, they weren't — the prospectus did not include the kind of loan-level information which would enable them to do that."*

Not to mention, I'd bet the farm that these billionaire investors have been cautioned/threatened quite heavily by those in gov not to pull on that tattered string coming out of Wall Street, for fear of causing – The Great Unraveling – TBTF – TBTJ.

I'm quite sure that TPTB in Washington wouldn't think twice about waterboarding even John Paulson, that is, after the next election is bought and paid for.

Hope and change yet again. Rinse, repeat. Doom.

Rev 2.0


**The A Man**, on <u>August 1, 2014 at 8:52 pm</u> said:
Discrimination lawsuit.


**The A Man**, on <u>August 1, 2014 at 3:07 pm</u> said:
Because the Judges Sherrifs District Attorneys Attorney Generals are either afraid of the banksters or are somehow in on it with them.
It doesnt take a genius to figure this out. Or simply dont care They get paid anyways why would they help us?

NEVER AGAIN


<u>**Deborah wynn**</u>, on <u>August 1, 2014 at 1:25 pm</u> said:
Typos. I'll try that again please,
The FDIC
have given me the run around – there's reasons for that of course. And it's time to hit them with FOIA suit. It's long over due. 6 yr SOL folks
Where's the class actions on behalf of the people who were actually harmed


<u>**Deborah wynn**</u>, on <u>August 1, 2014 at 1:19 pm</u> said:
Charles. I'm working it out the FDIC have given me hen run around, there's teadins for that of course,


**The A Man**, on <u>August 1, 2014 at 1:17 pm</u> said:
Dont blame the Banksters Blame the Government who lets them get away with it.

And if the Judge dont understand
<u>http://www.law.cornell.edu/uscode/text/18/4</u>

NEVER AGAIN


**The A Man**, on <u>August 1, 2014 at 1:16 pm</u> said:
"Produce the Note"
<u>http://www.dailykos.com/story/2011/02/23/948986/–Show-Me-The-Note-Foreclosure-Defense-Works#</u>

NEVER AGAIN



**Charles Reed**, on <u>August 1, 2014 at 1:15 pm</u> said:

Deborah wynn all of the WaMu government loans were being handled by Wells Fargo and being foreclosed illegally as if Wells Fargo was the owner of the debt. The FDIC with this fake deal with JPMorgan that hide the fact of who was handling what!



**Deborah wynn**, on <u>August 1, 2014 at 1:15 pm</u> said:

Louise it makes a complete mockery of the United States constitution
" life , liberty, property"
They take your home under a string of lies perjury under oath and 3rd party attestations not to mention the economic harm done.



**EULE**, on <u>August 1, 2014 at 1:08 pm</u> said:
another Order :

<u>http://wusfnews.wusf.usf.edu/post/relief-military-victims-predatory-lending</u>



**Deborah wynn**, on <u>August 1, 2014 at 1:06 pm</u> said:
How about these apples

<u>http://stopforeclosurefraud.com/2014/07/31/chavez-v-jpmorgan-chase-bank-n-a-chase-did-not-acquire-the-mortgage-loan-as-part-of-the-sale-from-the-fdic-instead-pursuant-to-a-mortgage-loan-purchase-and-sale-agreement-ps/</u>



**Diozark (@Diozark)**, on <u>August 1, 2014 at 12:49 pm</u> said:
Tired of Hearing about Countrywide, Bank Of America Has done a Great Job Stealing from Hard Working Americans all on Their Own.
Where are The Labor Unions in This Fight ? Nothing To Say while Your Membership is "Destroyed" Financially ? Not For The Good of The Union when your own members are needlessly suffering!



**louise**, on <u>August 1, 2014 at 12:36 pm</u> said:
In my case all three assignments are fraudulent, forged, robo-signed and not representative of the "alleged" transaction.



**Charles Reed**, on <u>August 1, 2014 at 11:26 am</u> said:

Folks what have I been telling you about the "holder in due course" for the last two years? Fannie took cover in DC & PA by ordering that all foreclosure are to be judicial and they provided more monies for attorney fees.

The reason is that Fannie expected that all the loan they purchase to have endorsed Notes (not blank endorsements) and prepared assignment, but not record the assignment because they don't need to be recorded if you purchase the Notes, but if you want to take action the assignment were due the day of the sale, so that if the loan fails the assignment can be recorded at any time. Fannie was saving monies as 98% of the loans were good performers and not need to spend monies recording something that was not going to be needed!

However as there was not a question by the counties about the ownership and in most case, as the originator still had possession of the blank Notes, and would act as if there was never a securities pooling situation that 99.9% of the register had a clue about securities, so the non-judicial foreclosures were allowed.

Now the State of Massachusetts is overturning 65,000 titles, the cat is out the bag what Fraud has taken place! MERS could not assign a single assignment and created Forgeries to trick the courts!



**patrickainsworth**, on August 1, 2014 at 9:26 am said:
It serves them right
,but why is no one in jail?



**Sheryl L. Sutter**, on August 1, 2014 at 9:11 am said:
How wonderful for the governments coffers....how many homeowners will benefit from this occurrence? None, I would venture to guess...

Create a free website or blog at WordPress.com. The Digg 3 Column Theme.

Follow

# Follow "Livinglies's Weblog"

Powered by WordPress.com

nakedcapitalism.com
http://www.nakedcapitalism.com/2014/08/randy-wray-setting-record-straight-one-time-bofas-rebecca-mairone-fined-1million-bofa-must-pay-1-3billion.html

# Randy Wray: Setting the Record Straight One More Time: BofA's Rebecca Mairone Fined $1Million; BofA Must Pay $1.3Billion

*By L. Randall Wray, Professor of Economics at the University of Missouri-Kansas City, Research Director with the Center for Full Employment and Price Stability and Senior Research Scholar at The Levy Economics Institute. Originally published at New Economic Perspectives*

Now here's Déjà vu all over again. You might remember the name Rebecca Mairone from a few years ago. She's back in the news:

> Rebecca Mairone, formerly a top official at Countrywide Financial, has been named in an amended complaint filed earlier this month by Preet Bharara, the U.S. Attorney for the Southern District of New York, against Countrywide and its parent Bank of America. The suit alleges that Mairone, as chief operating officer for Countrywide's Full Spectrum Lending division in 2007, set up a program dubbed the "High Speed Swim Lane," or "HSSL," or "Hustle," to speed up the origination of mortgage loans, including increasingly shady subprime loans. The government claims the alleged Hustle ultimately cost its sponsored entities Fannie Mae and Freddie Mac more than $1 billion in losses.
>
> The government has recently launched a flurry of lawsuits against major banks alleging mortgage fraud ahead of the crisis, none of the recent major suits have named individuals, making this case unique.
>
> Mairone now works for JPMorgan Chase and is in charge of that bank's efforts to compensate victims of foreclosure fraud, ProPublica recently reported."

See the HuffPost.

Back in the fall of 2010, Bill Black and I wrote a two part essay for the Huffington Post calling on Washington to go after the Foreclosure Fraudsters. Specifically, we pointed our fingers at the serial fraudsters at Bank of America. See here and here.

We argued it is time to Put Bank of America in Receivership:

> First, it is time to stop the foreclosures until the banks and servicers adopt corrective steps, certified as adequate by FDIC, that will prevent all future foreclosure fraud. They must also adopt plans to remedy the injuries their foreclosure frauds have already caused, and assist the FBI, Department of Justice, and legal ethics officials investigations of their officers' and attorneys' frauds and ethical violations.

*Second, it is time to place the financial institutions that committed widespread fraud in receivership. We should remove the senior leadership of the banks and replace them with experienced bankers with a reputation for integrity and competence, i.e., the honest officers that quit or were fired because they refused to engage in fraud. We should prioritize the receiverships to deal with the worst known "control frauds" among the "systemically dangerous institutions" (SDIs). The SDIs' frauds and fraudulent leaders endanger the global economy.*

*We propose Bank of America for the first receivership. In the last few weeks, the SEC has obtained a large (albeit grossly inadequate) settlement of its civil fraud charges against the former senior leaders of Countrywide. (Bank of America acquired Countrywide and is responsible for its frauds.) Fannie and Freddie's investigations — with their findings reviewed by their regulator, the Federal Housing Finance Agency (FHFA) — have identified many billions of dollars of fraudulent loans originated by Countrywide that were sold fraudulently to Fannie and Freddie through false representations and warranties. The Fed, BlackRock, and Pimco's investigations have identified many billions of dollars of fraudulent loans provided by Countrywide under false reps and warranties. Ambac's investigation found that 97% of the Countrywide loans reviewed by Ambac were had false reps and warranties. Countrywide also engaged in widespread foreclosure fraud. This is not surprising, for every aspect of Countrywide's nonprime mortgage operations that has been examined by a truly independent body has found widespread fraud — in loan origination, loan sales, appraisals, and foreclosures. Fraud begets fraud. Lenders that are control frauds create criminogenic environments that produce "echo" epidemics of control fraud in other professions and industries.*

*We have been amazed that, as one financially sophisticated entity after another found widespread fraud by Countrywide in the entire gamut of its operations, the administration, the industry, and the financial media act as if this is acceptable. Countrywide made hundreds of thousands of fraudulent loans. It fraudulently sold hundreds of thousands of loans through false reps and warranties. It fraudulently foreclosed on large numbers of loans. It victimized hundreds of thousands of people and hundreds of financial institutions, causing hundreds of billions of dollars of losses. It has defrauded more people, at a greater cost, than any entity in history.*

*Bank of America chose to purchase Countrywide at a point when it — and its senior leaders — were infamous. Bank of America made some of these Countrywide leaders its senior leaders. Yet, Bank of America is not treated as a criminal entity. President Obama, Attorney General Eric Holder, Donovan, and Barr cannot even bring themselves to use the "f" word — fraud. They substitute euphemisms designed to trivialize elite criminality. The administration officials do not call for Bank of America to be the subject of a criminal investigation. They do not demand that Fannie, Freddie, Ambac, the FHFA, and Pimco file criminal referrals about Countrywide's frauds. They do not demand that Fannie, Freddie, and the Fed refuse to purchase or take as collateral any mortgage instrument from Bank of America. No one at the Harvard Club in New York moves to kick Bank of America's officers out of their club! The financial media treats Bank of America as if it were a legitimate bank rather than a "vector" spreading the mortgage fraud epidemic throughout much of the Western world.*

Predictably, we got the usual attacks by trolls. Whenever you write a piece that argues that the biggest banks need to be held accountable for their frauds, they roll out the trolls. Usually, the trolls will not sign their defense of fraud with their real names.

However, that time, BofA tasked one Rebecca Mairone, Default Servicing Executive of Bank of America Home Loans, with writing an article to counter our piece. You can read her piece here.

In it she proposed to Set the Record Straight on Bank of America Foreclosures. Instead, she offered nothing but obfuscation:

> *Foreclosure is a wrenching personal situation for too many people. In their recent post, "Foreclose on the Fraudsters", William K. Black and L. Randall Wray do nothing to illuminate the challenges they face. When they aren't being merely misleading, the authors are just flat out wrong in discussing Bank of America's actions to help keep the economy moving forward, keep people in their homes, or ensure a fair and consistent foreclosure process if it comes to that. Missing from their presentation are some essential facts, including:*
>
> *•We stepped up to purchase Countrywide at a time when failure of that company would have been devastating to the economy, the markets, and millions of homeowners.*
>
> *•Our priority remains to keep people in their homes.*
>
> *•The vast majority of our portfolio — 86% — is current and performing.*
>
> *•Modification solutions are intensely focused on the 1.3 million customers who are more than 60 days delinquent — 85% of which are Countrywide originated loans.*
>
> *•Bank of America has completed nearly 700,000 permanent modifications including more than 85,000 under the government's HAMP program — the most of any servicer.*

Sure, BofA feels your pain, poor homeowner, as Mairone continued to oversee theft of homes, throwing the owners out onto the street. Now she's at JP Morgan, supposedly reducing the pain of those who've lost their homes to her thieving banksters.

Our response at that time to her is here.

We pointed out that:

> *Rebecca Mairone replied on behalf of Bank of America to our two-part post. Step back for a moment and consider the context of Bank of America's response. We cite evidence that the bank has committed massive fraud, explain that this provides a legal basis for placing it in receivership, and call on the FDIC to do so. Bank of America chooses to respond publicly, but its response never contests its massive fraud or our demonstration that there is a legal basis for placing it in receivership.*
>
> *Instead, Bank of America complains that we "do nothing to illuminate the challenges [BofA's home mortgagees] face." This is not our task; nevertheless, the claim is incorrect. We illuminate the problems posed by the fact that nonprime borrowers were frequently victims of mortgage fraud perpetrated by lenders as well as many other operatives in the unprecedented criminal lending and securities fraud of the past decade. This problem is typically ignored — at least by the financial sector and the mainstream media — so we did "illuminate" the problem and the cause of action borrowers could bring for "fraud in the inducement."*

*We showed that the fraudulent senior officers that controlled home mortgage lenders created "liars," and NINJA loan programs designed to induce millions of Americans to take out loans they could not afford to repay. The endemic underlying fraud in the origination and sale of nonprime loans is critical to understanding why loan defaults are massive, why borrowers were typically the victims of the fraud and lost their meager savings due to the frauds, why loan modifications typically fail, and why foreclosure fraud has been so common. The endemic fraud also hyper-inflated the bubble and helped cause the economic crisis and severe loss of employment. Over a million Bank of America borrowers face these "challenges" that we "illuminated."*

*Bank of America's response is guilty of what it criticizes; it ignores the fraud by nonprime lenders and sellers, particularly Bank of America's frauds in both capacities. It does not seek to "illuminate" the frauds or the problems that arise from endemic mortgage fraud. We did not invent the "epidemic" of mortgage fraud. The FBI began testifying about that in 2004. The FBI predicted that it would cause a "crisis" if it were not stopped — and no one claims it was stopped. The mortgage industry's own fraud experts opined publicly in 2006 that the type of loans that Countrywide decided to elevate to its favored product was an "open invitation to fraudsters" and fully deserved the phrase that the lenders used to describe the product: "liars' loans". (Bank of America chose to purchase Countrywide at a time when it was notorious for the awful quality of its mortgage loans.) It is the lenders and their agents, the loan brokers, that directed the lies in these liar's loans and appraisals and it was the lenders that made fraudulent "reps and warranties" in order to sell the fraudulent loans on to others in the form of securities. Economists and white-collar criminologists share a belief in "revealed preferences." The senior officers that control lenders provide an "open invitation to fraudsters" in the midst of an "epidemic" of fraud because they intend to profit from those frauds.*

*Instead of contesting its issuance and sale of massive numbers of fraudulent loans, Bank of America writes to provide data on delinquencies and foreclosures in support of its claim that it is the victim of Countrywide's deadbeat borrowers who it tries in vain to help. Bank of America's data, however, add support for the evidence of widespread mortgage fraud, particularly by Countrywide. Accounting control frauds maximize their (fictional) reported income by lending routinely to those who cannot afford to repay their loans. It is this aspect of the fraud scheme that is most counter-intuitive to those that do not study fraud, but to criminologists it provides the most distinctive markers of fraud. The senior officers that control fraudulent lenders maximize the bank's reported short-term income, in order to maximize their compensation, by growing extremely rapidly through making loans at a premium yield. This strategy creates a "sure thing" (Akerlof & Romer 1993). The lender is sure to report record (fictional) profits in the short term and suffer enormous (real) losses in the longer term.*

Irony of Irony. Guess what, folks. Mairone was outed as a fraudster a year ago. Read here.

She and her bank have been found liable for fraud in the types of activities that we had outlined.

*A federal jury in Manhattan on Wednesday found Bank of America liable for fraud because of thousands of defective mortgages sold by its Countrywide Financial unit, handing the government a victory in one of the few major trials rooted in the financial crisis. Government efforts to hold Wall Street accountable for crisis-era sins have primarily been resolved through settlements, leading to criticism that financial firms were given an easy way out, albeit an*

*expensive one. Taking the Bank of America case to trial and winning the judgment could start to change that perception.*

*On Wednesday, after a four-week trial, a jury of four men and six women said Bank of America and former Countrywide executive Rebecca Mairone were liable for one count of civil fraud. Prosecutors accused the bank and Countrywide of stripping safeguards designed to catch mortgage fraud and then peddling the loans to government-backed Fannie Mae and Freddie Mac. The mortgage finance twins were on the hook for more than $1 billion in losses once the housing market crashed, according to the complaint. The Justice Department wants Bank of America to pay up to $848.2 million, the gross loss that it claims Fannie Mae and Freddie Mac suffered on the loans. U.S. District Judge Jed Rakoff must decide on the penalty.*

Now she, personally, has to cough up a cool million bucks. That's nice. It should be a lot more. And she should be doing prison time.

It is not a surprise to us that the fraud was found. Fraud is everywhere at the biggest banks. Their business model was, and remains, fraud. Fraud can be found everywhere you look. All you have to do is look. Up to now, Washington has turned a blind eye to fraud at the nation's biggest fraudsters. While it is nice that they are finally going after some of the small fry fraudsters, like Mairone, it is time to go after the top fraudsters—those who oversaw and rewarded (and were rewarded for) fraud.

The illegal foreclosures continue. Every day people are still losing their homes. Lives and entire communities are being destroyed. People are literally dying because their homes are being stolen from them. Mairone was an executive at Countrywide before she went to BofA. She knew the fraudster's mode of operation very well—Countrywide was the most notorious originator of fraudulent mortgages in the country. Countrywide has directly caused countless deaths across the country.

Mairone's bank specialized in making mortgages with terms that the loan officers and executives like Mairone knew the borrowers could not possibly service. Fraud was the business model. Foreclosure was the expected result.

It doesn't have to be this way. Stop the fraudsters. Stop the foreclosures. There should be an immediate 5 year Country-Wide moratorium on foreclosures. Investigate the fraud. Jail the fraudsters. Put the biggest banks into receivership. Begin to clean-up the document mess created by the banks and MERS (the banks lost or destroyed all the records of property ownership). Our economy will not recover until this is done.

**TheStreet**

# Blonde Go-Getter Fined $1 Million in Bank of America Fraud Case

By Dan Freed | 07/30/14 - 06:44 PM EDT



Former Countrywide executive Rebecca Mairone/BLOOMBERG NEWS

NEW YORK (TheStreet) -- Rebecca Mairone was a mid-level Countrywide executive in a hurry when the housing market was booming. And that life choice has cost her $1 million, and a public shaming.

The $1 million fine to a woman whom U.S. District Court Judge Jed Rakoff on Wednesday described as "a relatively new employee who had to prove herself," was handed down by the judge as a penalty for what he called "an intentional scheme to misrepresent the quality of the mortgage loans that [Countrywide] processed."

Mairone worked on a program know internally at Countrywide as the "High Speed Swim Lane" (HSSL) and the "Hustle." Loans issued through the program were then sold to the so-called government-sponsored enterprises, **Fannie Mae** (FNMA) and **Freddie Mac** (FMCC).

Rakoff also fined **Bank of America** (BAC - Get Report) which bought Countrywide in 2008, roughly $1.26 billion over the same scheme, which a civil jury had already determined to be fraudulent in Oct. 2013 in response to charges brought by U.S. Attorney Preet Bharara.

"Evidence of the defendants' fraudulent scheme and fraudulent intent was ample," Rakoff wrote in his 19 page opinion.

Mairone was the scheme's "catalyst," according to Rakoff, choosing a word used by Countrywide's own employees to describe her role.

"Despite her implausible testimony to the contrary, from which the Court draws an adverse inference, there was convincing evidence that Ms. Mairone - the relatively new employee who had to prove herself - most aggressively pushed forward the HSSL fraud and most scathingly denounced those who raised concerns," Rakoff wrote.

He cited an instance where an employee "relayed to Ms. Mairone a lengthy list of concerns about the erosion of loan quality under the HSSL program."

In response, Mairone "not only gave his concerns the back of her hand but also directed thereafter that quality assurance reports be sent only to her rather than distributed more widely, that loan specialists no longer be notified of errors in their HSSL loans, that the quality-assurance checklist be eliminated, and that other changes be made to increase volume and sales at the expense of quality."

Mairone could not be reached for comment. Her attorney, Bracewell & Giuliani partner Marc Mukasey, sent the following statement via email:

"We continue to maintain that Rebecca never intended to defraud anyone and never did defraud anyone. Unfortunately, more powerful people chose her as a scapegoat because they thought she was an easy target. We will fight on to clear her name."

Rakoff acknowledged Mukasey's point in his opinion, referring to the lawyer as "Ms. Mairone's excellent counsel." (At another point the judge admitted he was "momentarily mesmerized by defendants' superb attorneys.")

Still, he added, "the fact that other, higher-level individuals arguably participated in the fraud but were, for whatever reason, not charged by the Government, does not significantly lessen Ms. Mairone's culpability for her leading role in the fraud."

Mukasey, who in March told *Reuters* Mairone now goes by her maiden name of Steele, declined all further comment.

Mairone was employed at **JPMorgan Chase** (JPM - Get Report) until July 1, according to an email Wednesday from bank spokesman Jason Lobo, who did not respond to additional questions.

Mairone will not pay the $1 million in one lump sum because Rakoff believes "while she is certainly not a candidate for welfare," doing so "would strain her resources to the limit." As a result, she must pay 20% of her gross income per quarter until the fine is paid.

As for Bank of America, spokesman Lawrence Grayson wrote via email that "We believe that this figure simply bears no relation to a limited Countrywide program that lasted several months and ended before Bank of America's acquisition of the company. We're reviewing the ruling and will assess our appellate options."

Follow @dan_freed

© 1996-2015 TheStreet, Inc. All Rights Reserved.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA ex rel.    :
EDWARD O'DONNELL,                   :
                                    :
            Plaintiff,              :
                                    :
      -v-                           :
                                    :
COUNTRYWIDE HOME LOANS, INC.,       :        12-cv-1422 (JSR)
COUNTRYWIDE BANK, FSB, BANK OF      :
AMERICA, N.A., and REBECCA MAIRONE, :        OPINION AND ORDER
                                    :
            Defendants.             :
------------------------------------x
JED S. RAKOFF, U.S.D.J.

     Early in the Great Recession, the Securities and Exchange

Commission brought suit against the three most senior executives

of Countrywide Financial Corporation,[1] alleging that the company,

at their behest, had falsely assured investors that, in the period

from 2005 to 2007, it was primarily a prime quality mortgage

lender, when in fact, "Countrywide was writing riskier and risker

loans." Compl. ¶ 4, SEC v. Mozilo, No. 09-cv-3994 (C.D. Cal. filed

June 4, 2009). The case was settled without the defendants

admitting or denying the allegations, and the Department of

---

[1] Countrywide Financial Corporation, originally named as a
defendant in this action, was dismissed on consent at the start of
trial. While there were a number of affiliated companies operating
under the Countrywide umbrella, this Opinion and Order uses the
term "Countrywide" to refer to remaining defendants Countrywide
Home Loans, Inc. and Countrywide Bank, FSB, except where the
context indicates otherwise.

Justice chose not to bring any criminal charges. But in 2012, a "whistleblower," Edward O'Donnell, a former Countrywide Vice President, filed a qui tam action alleging that another Countrywide program, known as the "High Speed Swim Lane" (or "HSSL" or "Hustle"), was the vehicle by which Countrywide had perpetrated a subsequent fraudulent scheme from August 2007 to May 2008.[2]

Eventually, the U.S. Attorney's Office took charge of the case, and proved, as the jury found, that Countrywide and one of its officers, Rebecca Mairone, had engaged in an intentional scheme to misrepresent the quality of the mortgage loans that it processed through the HSSL program and sold to Fannie Mae and Freddie Mac during the aforesaid nine-month period. As a result, the jury found Countrywide and its successor in interest, Bank of America, N.A. (collectively, the "Bank Defendants"), along with Ms. Mairone, civilly liable for fraud in violation of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a. See Jury's Verdict, ECF No. 312.

It is now up to the Court to determine what civil penalties should be imposed for that violation. See 12 U.S.C. § 1833a(a). This is no easy task, for the provision of the statute specifying

---

[2] See Government's Rebuttal Summation Tr. 3456:5-6, ECF No. 307 ("It took Ed O'Donnell to bring this fraud to public attention, to public scrutiny in this courtroom . . . .").

2

the monetary penalty to be imposed in cases like the instant one simply states that "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty . . . may not exceed the amount of such gain or loss." Id. § 1833a(b)(3). The statute provides no guidance, however, as to how to calculate such gain or loss or how to choose a penalty within the broad range permitted.

The parties and the Court have unearthed only one case that discusses this choice under FIRREA: United States v. Menendez, No. 11-cv-6313, 2013 WL 828926 (C.D. Cal. Mar. 6, 2013). Finding no precedent on point, Menendez looked to the case law of arguably analogous civil penalty statutes and suggested five factors to consider: "(1) the good or bad faith of the defendant and the degree of his scienter; (2) the injury to the public, and whether the defendant's conduct created substantial loss or the risk of substantial loss to other persons; (3) the egregiousness of the violation; (4) the isolated or repeated nature of the violation; and (5) the defendant's financial condition and ability to pay." Id. at *5 (citing Fed. Election Comm'n v. Furgatch, 869 F.2d 1256, 1258 (9th Cir. 1989)). Similarly, in discussing arguably analogous civil penalties in a non-FIRREA context, the Second Circuit has directed district courts to consider "the good or bad faith of the defendants, the injury to the public, and the defendants' ability

3

to pay." Advance Pharm., Inc. v. United States, 391 F.3d 377, 399-400 (2d Cir. 2004) (internal citation and quotation marks omitted). A similar list of factors is also used in determining civil penalties under the Securities Exchange Act. See SEC v. Gupta, No. 11-cv-7566, 2013 WL 3784138, at *1 (S.D.N.Y. July 17, 2013) ("In determining the appropriate amount of a civil penalty, courts in this District are typically guided by the factors set forth in Haligiannis, to wit: '(1) the egregiousness of the defendants' conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" (citing SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). But while these cases provide some general guidance as to what factors bear on what the penalty should be after the "cap" of gain or loss is determined, they do not speak to how "gain" or "loss" are defined or calculated.

At the invitation of the Court, therefore, the parties provided extensive briefing and oral argument on how "gain" and "loss" should be calculated and what these calculations should be. See ECF Nos. 311, 314, 315, 319, 322, 325, 329, 333, 337. After

4

reviewing these submissions, as well as the extensive evidence presented at trial, the Court finds as follows:[3]

FIRREA is a so-called "hybrid" statute, predicating civil liability on the Government's proving criminal violations (here, mail fraud and wire fraud) by a preponderance of the evidence. Unlike private civil actions, therefore, a FIRREA action is not primarily intended to serve compensatory functions but rather to serve quasi-civil punitive and deterrent functions. This is demonstrated on the face of the statute by the fact, inter alia, that the statute describes the monies to be paid, not as compensation to be paid to the immediate victim of the misconduct, but as a "penalty" to be paid to the Government. At the same time, because there is no threat of imprisonment nor the stigma associated with a criminal charge, the burden of proof is preponderance of the evidence and the so-called "rule of lenity" has no application. In short, FIRREA seeks to impose substantial civil penalties for criminal misconduct affecting federally insured financial institutions. 12 U.S.C. § 1833a(c)(2).

---

[3] The Court's calculations, like the parties', are not perfectly precise at every step, relying instead on reasonable estimates where appropriate. The use of reasonable estimates or approximations is well established in analogous contexts. See, e.g., United States v. Kumar, 617 F.3d 612, 632 (2d Cir. 2010) (sentencing); SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995) (disgorgement); United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009) (forfeiture).

5

In determining the appropriate penalty, therefore, as well as the appropriate definition and calculation of loss and/or gain, attention must be paid to precisely what predicate crime has been proved and what its essential elements are. Here, the essential crime found by the jury was "a scheme to induce Fannie Mae and/or Freddie Mac to purchase mortgage loans originated through the High Speed Swim Lane by misrepresenting that the loans were of higher quality than they actually were." Ct.'s Instructions of Law to the Jury at 11, ECF No. 265.[4] The HSSL program implemented this scheme by, inter alia, transferring primary responsibility for approving loans from quality-focused underwriters to volume-focused loan specialists employing automated underwriting software, eliminating the quality-assurance checklist, suspending the "quality of grade" compensation reduction that previously provided disincentives to low-quality loan origination, and reducing the "turn time" for loan funding from 45-60 days to 15 days. See, e.g., Defendants' trial exhibit ("DX") 191; Plaintiff's trial exhibit ("PX") 262; PX 31; PX 2661; PX 65; PX 67; Trial Transcript ("Tr.") 967:18-968:6, ECF Nos. 267-309. The Chief Operating Officer of the Full Spectrum

---

[4] The scheme was Countrywide's, but, after the events giving rise to this suit, defendant Bank of America, N.A. or its affiliates purchased Countrywide and thereby subsumed its liabilities. Although one of these affiliates, Bank of America Corp., was dismissed as a defendant in this action, Bank of America, N.A. does not contest successor-in-interest liability for purposes of this case.

Lending division of Countrywide, Rebecca Mairone, was a leader in designing and implementing the HSSL program. See, e.g., Tr. 1670:16-17.

Since the essence of the crime proved was a fraudulent scheme to induce Fannie Mae and Freddie Mac into purchasing risky mortgages originated through the HSSL program, the first thing the Court must determine in calculating loss or gain is how many HSSL loans were sold by Countrywide to Fannie Mae and Freddie Mac. The Government asserts that there were 28,882 such loans, while the Bank Defendants argue that there were only 11,481. This difference is the product of three factual disputes that the Court now resolves.

First, while both sides agree that the HSSL process began on August 13, 2007,[5] they disagree as to when the program ended. The Bank Defendants argue that the HSSL program ended in April 2008 when Countrywide reintroduced the quality-assurance checklist, while the Government contends that the HSSL ended only when underwriters were once again required to clear the loans for closing, beginning May 22, 2008. The Court agrees with the Government that the removal of experienced underwriters and their

---

[5] The Court finds, however, that 107 loans from the "pilot" period at the outset of the HSSL project should be excluded from the total. See Decl. of Lars Hansen dated Nov. 27, 2013 ¶ 6, ECF No. 320 (of 665 loans Bank Defendants urge excluded on this basis, 558 were cleared to close by a loan specialist).

continued absence from the clear-to-close process was at the heart of the HSSL scheme, and accordingly concludes that May 21, 2008 is the appropriate end date for defining the HSSL population.

Second, the Bank Defendants argue that, even within this period, there were loans that were in some degree reviewed by an underwriter at some point in the process and should therefore be excluded from the total. But even in these cases, it was the less experienced, less punctilious "loan specialists" who, relying chiefly on software, cleared the loans for closing, the critical tollgate on this high-speed highway. The Court will not exclude a loan from the HSSL population if it was cleared to close by a loan specialist merely because at some point in the origination process an underwriter glanced at it.

Third, the Bank Defendants contend that the Government's HSSL population wrongly includes non-HSSL loans processed through field branches. It is undisputed that the HSSL process was implemented at five "Central Fulfillment" ("CF") branches, which handled mortgage applications by telephone or electronically, as opposed to "field branches" where a potential borrower could walk in off the street. The CF branches were located in Richardson, Texas; Chandler, Arizona; Rosemead, California; Plano, Texas; and Hatboro, Pennsylvania. Tr. 1699:3-5. But there also existed field branches at these locations, and the Bank Defendants argue that the Government wrongly included in its population of HSSL loans

8

some 11,057 loans that were the product of activities by the field

branches in each of the five cities and that did not proceed

through the HSSL process. Bank Defs.' Loss Mem. at 20 (citing Tr.

2227:5-13). Indeed, the Government's own witness confirmed as

much. Tr. 336:22-24 ("Q: But generally, the field branches did not

use the procedure that was used for the production of Hustle

loans, am I correct? A: That's correct."). While the quality of

these non-HSSL loans may also have been overstated, this was not

the subject of any proof at trial. Accordingly, the Court will

consider the HSSL population to include only those loans processed

or funded by CF branches rather than by field branches.

The result of the foregoing determinations is that the

population of HSSL loans for purposes of determining loss or gain

is 17,611 (see Bank Defs.' Loss Mem. at 21 & n.11, less the 107

loans that the Government concedes should be excluded from the

pilot period).

But how much was the "gain" or "loss" on the fraudulent sale

of these 17,611 HSSL loans? The result varies hugely depending on

how broadly or narrowly one construes these terms, and what

purposes they are intended to serve. FIRREA itself does not

provide an adjective to modify either gain or loss other than

"pecuniary." Some other statutes do, but not in a way that allows

the Court to draw a coherent inference from these imperfect

9

analogies. Nor is the legislative history particularly illuminating.

The Bank Defendants place great weight on the Alternative Fines Act, which contains some language similar to FIRREA and was enacted only two years earlier. Specifically, the relevant section of the Alternative Fines Act states: "If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." 18 U.S.C. § 3571(d). Where the Alternative Fines Act uses "twice the gross gain or twice the gross loss" (emphasis supplied), FIRREA uses only "such gain or loss," leading the Bank Defendants to draw the negative inference that FIRREA's naked "gain" must be a "net" gain.[6] But as the Government points out,

---

[6] The Bank Defendants rely heavily for their "net" argument on United States v. Sanford Ltd., 878 F. Supp. 2d 137 (D.D.C. 2012), which concerned environmental violations by a fishing outfit under the Alternative Fines Act — a context that self-evidently does not lend itself to an easy analogy here. Similarly inapt are the precedents that the Bank Defendants marshal to suggest a "norm" of netting in the False Claims Act or other civil contexts calculating "damages." A FIRREA civil penalty, in contrast to a court's calculation of damages caused to the Government in an ordinary False Claims Act case, is calibrated to deter and punish, not to restore a victim to the status quo ex ante.

when Congress means to permit certain costs to be netted out, it is quite capable of stating so expressly. Compare 18 U.S.C. § 981(a)(2)(A) (civil forfeiture involving illegal goods or services "not limited to the net gain or profit realized from the offense") with id. § 981(a)(2)(B) (permitting a defendant convicted of illegally selling only legal goods or services to subtract from proceeds "the direct costs incurred in providing the goods or services" for forfeiture).[7] If, as the defendants assume, the penalty provisions of FIRREA were intended to take the opposite tack from those of the Alternative Fines Act, Congress could easily have so stated, either in the words of the statute itself or in its legislative history. This failure to do so strongly suggests that the Bank Defendants' negative inference argument is flawed or at least too conjectural to be relied on.

Moreover, as detailed above, FIRREA is in certain respects a unique statute, and, accordingly, the Court returns to the general principles referenced earlier: the civil penalty provisions of FIRREA are designed to serve punitive and deterrent purposes and should be construed in accordance with those purposes. This strongly cuts in favor of the Government's position that both gain

---

[7] Moreover, when Congress does see fit to deploy an adjective like "gross" or "net" to modify "gain" or "loss," it is not self-evident what specific costs are intended to be "netted" out.

and loss should be viewed simply in terms of how much money the
defendants fraudulently induced the victims to pay to them.[8]

While no analogy is perfect, a simple one will illustrate the
point. If I sold you a cow for $100 saying it was a healthy dairy
cow when I knew it had foot-and-mouth disease, you would in theory
have a net loss of less than $100 since the cow would still be
worth something as dead meat. But if you had known the truth, or,
short of that, had known that I as the seller was intentionally
lying to you about a material matter, you would never have bought
the cow in the first place, so your out-of-pocket loss of $100 is
really more reflective of the misconduct perpetrated upon you.
Similarly, since I would have spent some money to purchase or
raise the cow before I discovered it was diseased and duped you
into buying it, my net gain from the sale would have been less
than $100. But since you would have never purchased the cow from
me if you knew that it had foot-and-mouth disease or that I had
intentionally lied to you in trying to induce you to part with
your $100, the $100 I received, that is, my gross gain, is far

---

[8] Were the Court to accept the defendants' "netting" theory, then a
rebounding housing market could render FIRREA's penalty provisions
a nullity if a diligent fraud victim managed to recover more than
the principal owed at a foreclosure sale. Similarly, Fannie Mae's
and Freddie Mac's contractual right to require the Bank Defendants
to repurchase faulty mortgages could wipe out any penalty. Such a
reading of the penalty provision would thwart Congress's intent to
deter and punish FIRREA violators.

more reflective of the essential nature of my fraudulent misconduct than my "net" gain.[9]

It follows that, in this case, the amount of the victims' loss and the defendants' gain is identical, and consists of the price that Fannie Mae and Freddie Mac paid to Countrywide for the fraudulently misrepresented loans. The population of fraudulently misrepresented loans, moreover, consists not just of some subset of the 17,611 HSSL loans sold to Fannie Mae and Freddie Mac, but all of them. For even though, despite the defective processing, some of the HSSL loans may in fact have been of high quality (as described below), what the Government charged, and what the jury found, was an intentional scheme to defraud Fannie Mae and Freddie Mac brought about by designing a system of processing, the HSSL, that the defendants knew and intended would lead to loans being

---

[9] Analogies aside, it bears mentioning that by virtue of this fraud the Bank Defendants managed to unload a vast portfolio of risky assets on unwitting buyers and were thereby able to reduce the risk on their own balance sheet at a crucial moment in time. Indeed, Countrywide's introduction of the HSSL program coincided with a severe contraction of the market for riskier mortgages and Countrywide's understanding that it would no longer find willing buyers for the subprime mortgages that the Full Spectrum Lending division had churned out for years. Given that large, systemically risky portfolios of similarly dubious mortgage-backed assets were a significant contributor to the financial crisis, it strains credulity to imagine that FIRREA would require the Court to close its eyes to the overarching fraud and ask, "Yes, but what did the victims manage to recover in foreclosure?" The use of a "net" amount to calculate gain or loss would therefore fundamentally misconstrue the nature of the fraud and undermine Congress's directive that the Court penalize and thereby deter this serious misconduct.

represented to be of a materially higher quality than they actually were. The happenstance that some of the loans may have still been of high quality should not relieve the defendants of bearing responsibility for the full payments they received from the scheme, at least not if the purposes of the penalty are punishment and deterrence. Relatedly, if the victims had known that the defendants were lying to them about the quality of the loans produced by the HSSL process, they would never have purchased any of the loans so generated, or parted with any of their money, so the happenstance that some of the loans turned out to be of high quality would be irrelevant from a deterrence standpoint.

In short, the proper measure of both loss and gain in this case is the amount Fannie Mae and Freddie Mac paid to Countrywide for the entire 17,611 HSSL-generated loans. This sum is $2,960,737,608.[10]

While this sets the upper limit for the penalty, the Court, in its discretion, may impose a lesser penalty after consideration of the relevant mitigating factors. In the Court's view, however,

---

[10] This sum is arrived at by taking the ratio that 17,611 bears to 28,882 and multiplying it by the $4,855,602,953 that the Government represents was the amount that was paid to Countrywide for the 28,882 loans. See Declaration of Dr. Joseph R. Mason dated Jan. 29, 2014 ("Mason Decl.") ¶ 5, ECF No. 326. This assumes that the average price of the 17,611 loans was not materially different from the average for the 28,882 loans, an assumption shared by both parties' briefing.

only one of the direct and indirect economic effects on which the
Bank Defendants place such emphasis in their mistaken argument for
net gain and net loss is a worthy candidate for mitigating the
penalty. Specifically, while Fannie Mae and Freddie Mac would
never have purchased any loans from the Bank Defendants if they
had known that Countrywide had intentionally lied to them about
the loans' quality and had, indeed, created a program for
processing the loans that virtually assured that many of the loans
would be of lesser quality than represented — and even though, as
indicated above, determination of a FIRREA penalty is primarily a
matter of punishment and deterrence, rather than compensation of
the victims — still, the fact that a meaningful number of the HSSL
loans that Fannie Mae and Freddie Mac purchased turned out to be
of acceptable quality is an appropriate factor for the Court to
consider in assessing the egregiousness of the offense. Here, the
Government's own expert concluded, in testimony the Court credits,
that 57.19% of the HSSL loans proved, in the end, not to be
materially defective. See Mason Decl. ¶ 6. On this basis, the
Court will reduce the penalty to be imposed to 42.81% of the
statutory maximum, or $1,267,491,770.

Turning to other mitigation factors, however, the Court finds
none that warrants a further reduction in the Bank Defendants'
penalty. Although at one point in the trial the Court, momentarily
mesmerized by defendants' superb attorneys, commented that this

was a "close case," Tr. 3169:10, the careful review of the evidence that the Court has conducted in connection with determining the penalty has convinced the Court, as it did the jury, that the evidence of the defendants' fraudulent scheme and fraudulent intent was ample. That evidence, coupled with the adverse inferences to be drawn from the implausible testimony of Ms. Mairone and other defense witnesses, proved convincingly that the defendants were fully prepared to jettison reasonable steps to assure loan quality in favor of volume, speed, and profits. Even when Countrywide's own internal quality reports evidenced deteriorating loan quality, see, e.g., PX 56, PX 406, PX 408 — concerns echoed by Mairone's own front-line staff, see, e.g., PX 52 — the defendants shunted critics and criticisms aside, doubled down on their risky behavior, and applied ever more pressure on loan specialists to ignore loan quality concerns, see, e.g., PX 253, PX 262, PX 489, PX 524. Furthermore, defendants purposefully ignored their contractual obligations to report to Fannie and Freddie all loans-identified as defective, reporting only six HSSL loans as such, when, in fact, there were thousands. See, e.g., Tr. 1703:5-10.

     In short, while the HSSL process lasted only nine months, it was from start to finish the vehicle for a brazen fraud by the defendants, driven by a hunger for profits and oblivious to the harms thereby visited, not just on the immediate victims but also

16

on the financial system as a whole.[11] The HSSL fraud, simply by
itself, more than warrants a penalty of $1,267,491,770.

Having completed the determination of the penalty with
respect to the Bank Defendants, the Court turns to Ms. Mairone.
Not a little of the responsibility for this fraud can be laid at
her doorstep. Despite her implausible testimony to the contrary,
from which the Court draws an adverse inference, there was
convincing evidence that Ms. Mairone — the relatively new employee
who had to prove herself — most aggressively pushed forward the
HSSL fraud and most scathingly denounced those who raised
concerns. Thus, for example, when Mr. O'Donnell relayed to Ms.
Mairone a lengthy list of concerns about the erosion of loan
quality under the HSSL program, she not only gave his concerns the
back of her hand but also directed thereafter that quality
assurance reports be sent only to her rather than distributed more
widely, that loan specialists no longer be notified of errors in
their HSSL loans, that the quality-assurance checklist be

---

[11] Whether the HSSL program was symptomatic of more pervasive fraud
at Countrywide, the Court cannot say, since, as noted, the SEC's
case against its highest officers was settled without the
defendants admitting or denying liability. See Settlement
Agreements, SEC v. Mozilo, No. 09-cv-3994, ECF Nos. 481, 482, 483
(C.D. Cal. Oct. 15, 2010). While, moreover, the Government
proffered in the instant case an email from another Countrywide
executive, Cindy Simantel, in which she informs Countrywide's
Chief Credit Officer Rod Williams that she lied to Freddie Mac to
conceal the awful quality of certain non-HSSL loans, see ECF No.
165, Decl. of Malachi Jones, Ex. A, the Court excluded the email
from introduction at trial and will not consider it here.

17

eliminated, and that other changes be made to increase volume and sales at the expense of quality. See, e.g., PX 68.

In his instant papers, Ms. Mairone's excellent counsel argues, among much else, that Ms. Mairone did not act alone and that many of her actions and others were taken in consultation with her division's Chief Executive Officer and Chief Credit Officer. See ECF No. 314. Indeed, the jury itself wanted to know why these other officers were not also named as defendants. See Tr. 3478:8-9. But the fact that other, higher-level individuals arguably participated in the fraud but were, for whatever reason, not charged by the Government, does not significantly lessen Ms. Mairone's culpability for her leading role in the fraud. She was, in the eyes of Countrywide's own employees, the HSSL's "catalyst." Tr. 1670:16-17.

There is one obvious difference, however, between Ms. Mairone and the Bank Defendants, and that is in ability to pay a substantial penalty. Chiefly for this reason, the Government itself seeks to impose on her a penalty of no more than $1,200,000. See Mar. 13 Hr'g Tr. 4:11, ECF No. 337. Furthermore, the Court has personally reviewed Ms. Mairone's financial records submitted under seal, and finds that, while she is certainly not a candidate for welfare, and is likely to remain employed in lucrative positions for the foreseeable future, to impose on her the lump sum payment of $1,200,000 million requested by the

18

Government would strain her resources to the limit. Accordingly, the Court orders that she pay a total of only $1,000,000, and over a period of time. Specifically, she is to make quarterly payments of 20% of her gross income for the previous three months until the full $1,000,000 is paid.

For the foregoing reasons, the Clerk of the Court is directed to enter Final Judgment directing Bank of America, N.A., on behalf of the Bank Defendants, to pay to the Government by no later than September 2, 2014 the sum of $1,267,491,770 and directing Ms. Mairone to pay the Government quarterly payments of at least 20% of her gross income for the previous three months, such payments to be made within one month of the end of each such quarter beginning with the quarter ending September 30, 2014 and continuing until she has paid a total of $1,000,000.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:     New York, NY
           July 30, 2014

19